In the Matter of JOSEPH A. YOUNG, an Attorney, Respondent.

First Department, July 3, 1919.

**Attorney at law — suspension from practice — procuring client to invest money resulting in loss — unauthorized signature of firm name on bond.**

Attorney at law suspended from practice for procuring a client, who relied absolutely upon him and the firm of which he was a member, to invest a large sum of money in a hazardous enterprise for the benefit of another client, and for signing a bond given as security for said loan in the name of his firm without authority, although said attorney did not intend to defraud the party loaning the money or to make a pecuniary profit out of the transaction.

DISCIPLINARY proceedings instituted by the Association of the Bar of the City of New York.

*Einar Chrystie* [*William Bradford Roulstone* of counsel], for the petitioner.

*Joseph A. Young,* respondent in person.

CLARKE, P. J.:

The respondent in February, 1907, was admitted to practice at a term of the Appellate Division, First Department and was practicing as such in the First Judicial District at the time of the acts complained of.    He was charged with misconduct as an attorney at law.

In 1907 or 1908 one Edward Grady, a letter carrier, retained the firm of Whalen & Dunn, of which the respondent was a member, to represent him in certain street opening proceedings.    As a result of these proceedings Grady recovered from

the city about $13,700. Subsequently Grady spoke to respondent about investing some of this money and the respondent suggested that he lend to one George M. Dunn, a contractor, $7,000 which Dunn needed to carry on a contract with the city of New York for the construction of certain sewers.

The learned official referee has reported the facts as follows: " According to the testimony of Grady he did not know Dunn and was persuaded by the respondent to make the loan, and that he refused to do so until the respondent represented to him that the firm of Whalen & Dunn would give him a bond to indemnify him against any loss in the event that Dunn failed to repay the money with interest. Upon this understanding and the assurance of the respondent that the latter would take care of his interests, Grady lent Dunn $7,000 and received as security therefor the note of George M. Dunn in the sum of $7,000 dated July 10, 1912, payable to the order of Edward Grady on November 1, 1912, and indorsed by the respondent in the name of Whalen & Dunn, together with an assignment to Grady executed by George M. Dunn on the 10th day of July, 1912, of $7,000 of the moneys due and to grow due under the contract between Dunn and the City of New York. Grady also received a bond for $7,000 dated July 12, 1912, and executed by the respondent in the name of Whalen & Dunn to indemnify Grady in the event that Dunn failed to repay the money loaned. At this time the firm of Whalen & Dunn consisted of Patrick H. Whalen and the respondent, Mr. Dunn having died in January, 1904. George M. Dunn, the contractor, was a brother of Mr. Dunn, the deceased member of the firm of Whalen & Dunn. The note above mentioned was endorsed and the bond executed by the respondent in the name of Whalen & Dunn without the knowledge or consent of Mr. Whalen who knew nothing of the transaction and received no profits therefrom. The assignment which was given to Grady by the respondent was never filed. Subsequently the respondent obtained and filed another assignment executed by Dunn to Grady on the 25th day of July, 1912, of $7,000 on the ' final payment ' due Dunn under the contract in question. After the respondent had given the first assignment to Grady, which was never filed, and before he filed the second assign-

ment the respondent permitted two other assignments aggregating about $2,000 of the moneys due under the same contract and executed by Dunn to two other creditors to be filed. Some time thereafter the respondent induced Grady to execute a cancellation of the assignment which had been filed and upon the filing of it Grady lost his lien upon the funds to be paid Dunn under the contract.

" The facts so far stated stand admitted by the testimony of the respondent and the answer interposed in this proceeding except as follows:

" Respondent denies that he received from Grady $7,000 or that Grady lent to Dunn $7,000 and he insists that Grady parted with only $6,000 upon the understanding that for advancing or loaning Dunn $6,000 he, Grady, was to receive a $7,000 interest in the final payment on Dunn's contract to cover the amount of the loan and interest to be computed on the sum of $7,000 from July 10, 1912. In analyzing the conflicting testimony upon this point it will be found that the funds withdrawn by Grady from Savings Banks aggregated $6,000 and no more; that the moneys he claimed to have kept at his home in anticipation of having to pay an assessment becoming due and payable thereafter amounted to about $800 and that altogether his testimony and that of his wife as to how the sum of $7,000 was completed is very unsatisfactory. Taking altogether and it clearly appearing that Grady contemplated an investment which would yield more to him than mere legal interest, it may fairly be concluded that the respondent's testimony upon this point is the more trustworthy. The respondent has also shown that he never received any fee from either Grady or Dunn on account of the transaction and never derived any profit from it.

" The respondent freely conceded, however, that he acted as attorney and counsellor for both parties throughout. According to his testimony Mr. Whalen was almost wholly inactive in the management of the business of the office; that for a long period prior to the transactions in question almost all questions relating to business of clients had been left to the judgment and decision of the respondent; that in such matters he proceeded alone and assumed whatever responsibility they entailed; that for these reasons he did not speak

to Mr. Whalen about the transaction and did not consider it necessary that he should do so or that the bond to bind Mr. Whalen should be signed by the latter personally, and that he so told and assured Grady.

" His permission to allow two other creditors to file assignments from Dunn for moneys due under the contract ahead of the assignment to Grady, the respondent sought to justify by stating that it was done to prevent those creditors from filing mechanics' liens which they had threatened to do, and that it was done on his advice and under authority received from Grady to do whatever he deemed advisable to avoid liens and to assist the performance of the work to completion. The assignment to Grady executed by Dunn on July 25, 1912, the respondent filed with the Comptroller as soon as he received a letter from Dunn saying that he had abandoned the work. This second assignment differed materially from the assignment of July 10, 1912. The latter was for $7,000 of the moneys due and to grow due under Dunn's contract while the former provided for the payment of the $7,000 out of the ' final payment ' which might become due to Dunn. According to respondent's testimony it further appears that immediately after the filing with the Comptroller of the second assignment to Grady the respondent took steps to bring about the completion of the contract work and after negotiations with one Mark Harris, the latter by agreement dated August 29, 1912, agreed to finish the work. There existed then a deficit of about $5,000 which was supposed would be made up by the profit on the work to be done. Harris, however, insisted on the cancellation of the assignment to Grady which had been filed if he was to finish the work. Respondent then told Grady that in order to straighten the matter out he required a cancellation of Grady's filed assignment, that Grady executed a cancellation, saying that he knew nothing about the details and that whatever the respondent did in the matter he, Grady, believed would be right and the cancellation was filed. The work was finished by Harris early in 1913, and the final payment made in August, 1913, and then it became apparent that the work had been finished at a loss instead of a profit and that nothing was left for Grady. After Grady had been informed of the result he retained other counsel and the

respondent having been told that there was a question as to
the liability of Mr. Whalen on the bond because he had not
signed it, the respondent agreed to stand the loss himself,
believing that Dunn would eventually be able to repay him
and probably pay a portion of Grady's claim himself.  Grady
thereupon promised to disregard the bond and to look to the
respondent and Dunn for the payment of his claim, to waive
any claim against Whalen on the bond, and even to give the
respondent and Dunn time to pay the principal if they kept
paying the interest.  In accordance with this understanding,
the respondent in April, 1913, paid Grady $1,000 on account
of the principal and in December, 1913, $400 for interest, and
on June 5, 1915, $168 on account of interest.

" In January, 1914, the firm of Whalen & Dunn was dis-
solved and the respondent in settling his partnership affairs
with Mr. Whalen made no mention to the latter of any claim
by Grady on the bond.

" In April, 1916, Grady on failing to receive any more interest
again retained counsel and made some efforts to induce
Mr. Whalen to pay some of the loss, but without success.
Grady has never commenced an action against the respondent
to recover his claim or any part thereof and the respondent
testified before me that he was liable for the balance due to
Grady and that, if an action were brought against him to
enforce such liability he would never interpose a defense of
any kind."

The respondent, in his brief, admits the accuracy of the
statement of facts in the report of the learned referee above
set forth.  The learned referee further states that " after a
careful examination of the whole case I feel satisfied that the
respondent did not intend to defraud Grady nor did he make or
bargain for a pecuniary profit out of the transaction."  But
he proceeds:

" Grady is a letter carrier and was not acquainted with
the legal questions involved nor aware of the risks he ran.
He did not come to the respondent for legal assistance in
carrying out the transaction which he had already resolved
upon.  The respondent came to him and persuaded him to
make the loan and that it was safe for him to do so in the
manner proposed by the respondent.  Grady implicitly

trusted the respondent as his legal advisor and while he was aware that the respondent also acted as the legal advisor of Dunn he nevertheless left all the safeguarding of his interests to the respondent and repeatedly told him so. The duty, therefore, devolved upon the respondent to use the requisite care and caution and circumspection for that purpose. This he did not do and could not do in attempting to serve equally well another client who had highly conflicting interests. This was clearly unprofessional. Moreover his conduct in persuading Grady to enter into a transaction which was clearly usurious and to assume the risk incident thereto as well as to run the risk and hazards of a profitable performance of the contract in question and then to waive and otherwise jeopardize rights of Grady which had accrued in order to accommodate another client with conflicting interests is still more indefensible.

" The conclusion cannot be avoided that the respondent has been guilty of professional misconduct in the respects mentioned."

In addition to the facts above set forth as bearing upon the respondent's conduct the evidence shows that before Grady delivered the money he received a note signed by George M. Dunn indorsed by Whalen & Dunn and a bond signed Whalen & Dunn by Joseph A. Young, and that the firm signature in both instances was written by the respondent. Being cross-examined by the respondent upon the hearing Grady testified as follows: " Q. What was your reason for making this loan to Mr. Dunn, mostly because I asked you to do it? A. Mostly because you asked me and I thought I had a respectable firm of lawyers to deal with and would not do me any harm and you would take care of my interests, and I gave it on that ground and no other. I thought I was dealing with good people * * *. The bond and the note were delivered before I paid you any moneys. * * * Q. Did you know or not know that Mr. Whalen did not know about this bond at the time you paid this money over? A. I asked you if Mr. Whalen knew about it and you said yes. Q. Did I not say that Mr. Whalen does not know anything about that matter or any of the business? A. No, if you did I would not give it to you, that would finish you,

if I knew that Mr. Whalen did not know anything about it you would not get my money. You never said anything like that."

The conclusion is unavoidable that the respondent procured his client to invest this large sum of money, for a man in his position of life, relying absolutely upon him and the firm of which he was a member in a hazardous enterprise for the benefit of another client, and that the security for the loan which he led Grady to believe he had, namely, a bond of his firm and an assignment of the moneys due and to become due upon the contract, were worthless. It was solely as a consequence of respondent's previous professional relations with Grady, and as a result of which Grady received the money, that Grady loaned a portion thereof, under the circumstances disclosed, to Dunn. It is obvious that he relied upon the respondent to take care of his interests and that he executed all the papers which the respondent requested under the belief that thereby his interests were being protected and safeguarded. It is equally obvious that the respondent sacrificed the interests of Grady for the benefit of his other client. We, therefore, approve of the conclusion of the official referee that the respondent has been guilty of professional misconduct. Further we cannot overlook his unauthorized signature of his firm name to the bond, not only in its relation to Grady as an inducement for him to enter into the transaction, but as involving his partner, Mr. Whalen, without jurisdiction, in this outside business transaction. While we do not disagree with the learned official referee in his conclusion that the respondent did not intend to defraud Grady and did not make a pecuniary profit out of the transaction, nevertheless we feel that his conduct was highly unprofessional and that he should be disciplined by suspension from practice for the term of one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions to be incorporated in the order to be entered hereon.

LAUGHLIN, SMITH, PAGE and MERRELL, JJ., concurred.

Respondent suspended for one year. Order to be settled on notice.