In the Matter of EVERETT W. BOVARD, an Attorney, Respondent.

First Department, February 14, 1930.

*Isidor J. Kresel* of counsel [*F. Sims McGrath* with him on the brief], for the petitioners.

*Daniel F. Cohalan* of counsel [*George J. Langley* with him on the brief], for the respondent.

DOWLING, P. J.   The respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, Second Department, in February, 1910.

Respondent is charged with misconduct as an attorney at law in that between January 1, 1925, and July 1, 1928, he accepted

seventy retainers from persons claiming damages for personal injuries, knowing that they had been solicited and procured for him by investigators of the Employers' Liability Assurance Corporation, by direction of the superintendent of claims, Charles E. Cherry, and knowing that the investigators had represented to more than ten of the claimants that they would be paid certain sums of money for their support during the pendency of the suits if they would retain the respondent. It was charged that they were so paid by the company and that the respondent paid the investigators and Charles E. Cherry part of his fees as compensation for services in soliciting the retainers.

After respondent answered, the matter was referred by order of this court to a referee to take testimony with regard to the charges and to report the same with his opinion thereon. The referee has duly reported, and petitioners move to have respondent adjudged guilty of professional misconduct as charged.

Respondent testified that he entered the employ of the Employers' Liability Assurance Corporation and started to try Municipal Court cases in 1912. He remained with it for over twelve years. About 1922 the partnership of Pettigrew, Glenney & Bovard was formed. This partnership represented the assurance corporation. In February, 1925, respondent withdrew from the partnership and opened an office of his own. For some time after the opening of his own office, respondent was retained as trial counsel to try some of the company's cases.

This insurance company insured a great number of employers under the Workmen's Compensation Law. Among the employees who were injured and whose claims for compensation the company was obligated to pay there were some who were entitled, owing to the circumstances of their injury, to claim damages against third parties. Referring to these, the referee said: " The insurance carrier was vitally interested in those causes of action for if the employee elected to take the statutory compensation it was obliged to pay it and thereupon by virtue of Section 29 of the Statute the cause of action became automatically assigned to the carrier which could maintain it in its own name. If the employee accepted compensation he would be no longer interested in the cause of action and it is manifest that it would be much more difficult for the carrier to prove it than if the action were brought by the employee. It is also evident that a recovery by the carrier would be more doubtful than if the action were brought by the employee and that in any event the recovery would likely be for a smaller amount. Moreover, when the third party was responsible it was plainly to the interest of the employee, if his immediate necessities did not require that

he accept compensation, to reserve his right to compensation, as he could do by notice under Section 29 of the Statute and prosecute the third party action himself because his statutory compensation was limited to part only of his loss of wages and he would receive nothing for pain and suffering and in the event of death nothing would be awarded to his family for loss of society and advice whereas those are elements of a recovery in an action at common law and fully pass to the carrier if compensation is accepted. [*Lang* v. *Brooklyn City R. R. Co.*, 217 App. Div. 501; affd., 247 N. Y. 551; *Travelers Ins. Co.* v. *Brass Goods Mfg. Co.*, 239 id. 273; *Schubert* v. *Finkelstein*, 216 App. Div. 702; affd., 244 N. Y. 583; *Lester* v. *Otis Elevator Co.*, 169 App. Div. 613; *Employers' Liability Assurance Corp., Ltd.,* v. *Wagner*, 220 id. 123; *Casualty Co. of America* v. *Swett E. L. & P. Co.*, 209 id. 175.]

" If an injured employee by such notice reserved his right to compensation and brought a third party action and was unsuccessful or failed to recover or collect an amount equal to the statutory compensation, the insurance carrier would be obliged to pay the balance of the compensation but would then receive no assignment of the cause of action. [*Matter of Zirpola* v. *Casselman, Inc.*, 237 N. Y. 367.] If the recovery in a third party action brought by an employee equalled or exceeded the statutory compensation then the insurance carrier would not be obliged to pay any compensation. It would only be obliged to pay the statutory compensation less any such recovery (Section 29, Workmen's Compensation Law). Although under said Section 29 the settlement, without the consent of the insurance carrier, of a third party action brought by an employee precludes the recovery of any statutory compensation, there is no like provision in case the third party action is abandoned or discontinued and since the Statute of Limitations runs against the assigned cause of action from the date of injury or of death it is possible that the insurance carrier would be compelled to pay compensation after the Statute of Limitations has run against the cause of action which only becomes assigned under the Statute upon compensation being paid. [*Exchange M. I. Ins. Co.* v. *Central Hudson Gas & El. Co.*, 243 N. Y. 75; *Bennett* v. *Page Brothers*, 197 App. Div. 745.]

" The Legislature recognized that the insurance carrier is deeply interested in the common law causes of action even if prosecuted by the party injured or his personal representatives and for this reason required the filing of a notice of election in or to enable the insurance carrier to protect its interests in the prosecution of the third party action and precluded a recovery of any compensation if such notice be not filed. [*Lester* v. *Otis Elevator Co.*, 169 App.

Div. 613; *Miller* v. *New York Railways Co.*, 171 id. 316; *Schubert* v. *Finkelstein, supra; Baeringer* v. *City of New York*, 212 App. Div. 857; *Sabatino* v. *Crimmins Construction Co.*, 102 Misc. 172; affd., 186 App. Div. 891; *Lang* v. *Brooklyn City R. R. Co., supra.]* "

Charles E. Cherry was the superintendent of claims of the Employers' Liability Assurance Corporation, and during the time of respondent's association with the assurance corporation he became personally very intimate with Cherry. When respondent opened his own office he talked with Cherry about these third party claims. Respondent testified: " I had a conversation with him [Cherry] about the third party cases in which they were discussed, and, subsequently, the question was taken up on my part whether I could try some of them, and on his part, whether he would send them to me." In the investigation before Mr. Justice WASSERVOGEL, Cherry testified that he instructed Mr. Harry E. Wieting, in charge of the compensation department, " that he should inform the supervisors and investigators that they should on all occasions advise injured claimants of their rights, if they had a third party action, and if they hadn't an attorney to suggest Mr. Bovard." These instructions were issued early in the year 1926. Respondent testified in that proceeding that he received forty cases the first year he was in practice, twenty-two the second year, and eight the last year. It appears that the assurance corporation had some 6,000 employees' compensation claims per annum, and approximately 200 of such claimants had common-law causes of action against third parties for personal injuries.

The testimony is that Wieting prepared forms of retainers for respondent and distributed them among the investigators. Blank forms were also kept in the compensation department. Wieting testified that he did not get the forms from either Cherry or respondent. Cherry testified that he did not know retainers for respondent were being obtained. Respondent was aware of the existence of the form of retainer. Wieting testified that in some instances where respondent was retained in these third party actions advances were made to the claimants; Cherry testified that he helped such clients of respondents, " By advice, and in a few instances we advanced money, yes, loaned money, and took care of them medically." No money was advanced to clients of other lawyers. In one case, the Feldman case, the investigator, Stern, testified that Feldman was in Bellevue Hospital, very seriously ill, and unable to talk intelligently; his wife was there and Stern spoke with her, explaining that the man had not only a right of action against the employer, but also against the third party; the wife was willing but would not do anything without the advice of an uncle; on visiting

the uncle he said he did not think he wanted to retain any of the insurance company's counsel, but would think it over. He had in mind another lawyer whom he wanted to retain. Stern testified that he stated to the uncle and the injured man's wife that his company would be willing to make an advance of twenty dollars a week, pending the lawsuit, if respondent were retained. Several days later the uncle telephoned and said " that he had decided that it would be for the best interest of the injured and his family if the injured man could receive an allowance " from the insurance company, and that if Stern would accompany him to the hospital he would have the injured man sign the retainer. Stern obtained the retainer and gave it to respondent. Stern testified he told respondent how he obtained it. There is no evidence of inducement in any other case.

The record discloses that during the period covered by the charges herein, respondent paid to five of the investigators of the insurance company a total of $650, and that during the same period he paid Cherry $3,400. Respondent's fees from third party claims totaled $12,739.22.

As to the payments to the investigators, respondent testified: " I think I always paid the investigator for his investigation. The amount, of course, depended on what we got." And further, in response to the question whether or not it was a fact that in making the payments to the investigators he was influenced in part at least by his desire to have their good will, he testified: " I wanted to have their good will, but I am telling you that I did not pay them for their good will. Listen, let me tell you something. You asked me a lot of questions about paying money to these investigators. You know by these records that the moneys that were paid were paid a year after the case came in; that they weren't paid to all the men. You know if a year and a half afterwards, as to how much I paid each one, or anything of that sort, whether it was good will or not. The thing speaks for itself; it was done without any system and without any plan or device of looking up as to how much time they spent on this and how much time they spent on that, or whether it was to get their good will. The facts speak for themselves." He further testified: " * * * As I understand the facts he [the investigator] was directed by the general orders of this insurance company to send cases to me, and that is what he was supposed to do. I wasn't paying him for doing that because the insurance company instructed them to send them to me. I did not pay them money to bring the cases to me when they were directed to bring them to me, and I did not try to see that they stuck to their orders."

As to the payments to Cherry, who is a member of the bar, respondent testified that he consulted with Cherry about all of his third party actions. Cherry himself testified that the assistance he gave respondent was given after hours. He testified that he assisted other lawyers in third party cases. He received no part of the fees of those other attorneys. The following question and answer are pertinent: " Q. Why wasn't it just as much of your duty to do what you did in the Bovard cases? A. The information that I furnished these other lawyers was done by others in my department and in the course of my employment, and any help and assistance I gave Mr. Bovard was after hours and apart from my duties as an executive there."

Cherry further testified: " I did not personally assist any other lawyers. I made it possible for him to get assistance through the staff under me."

It appears that originally the efforts made to secure retainers for respondent were made without the knowledge of any official of the assurance corporation. Subsequently when they learned that this was being done they approved of it. They also approved of payments made to their investigators.

The referee has found that the payments made to the investigators were not made in consideration for the procurement of the retainers. We think the record sustains such a finding. The referee said: " I am of opinion that attorneys in making payments to investigators under such circumstances [as those described herein] should limit them to the fair and reasonable value of the services rendered after the attorney has been retained and that bonuses in excess thereof should not be given." In this we concur.

Speaking of the payments to Cherry, the referee said: " Cherry, in advising and assisting respondent was furthering the interests of his employer. * * * It is lawful for attorneys to divide their fees and if it were not for the circumstances presently noted there would have been no impropriety in the respondent's sharing his fees with Cherry. If the respondent and Cherry had been less honorable and worthy members of their profession the sharing of fees might have worked to the detriment of Cherry's employer by the continuance of the practice of soliciting retainers for respondent when it might not be to the interest of such employer to have him so retained and in such case the representative of the insurance carrier might find himself confronted with a personal interest conflicting with his duty to his employer." A reading of the testimony of one of the officers of the assurance corporation satisfies us that there was no such conflict here.

Referring to the solicitation of retainers for respondent in these

third party claims, the referee said: " * * * The insurance carrier was warranted in advising such claimants to bring third party actions and in requesting them to retain the respondent whom it knew to be competent and in whom it had confidence. In thus soliciting such retainers for respondent the carrier was not acting for or in the interest of the respondent but for itself and in its own interest. In thus directing that claimants be requested to retain the respondent, Cherry at the outset acted upon his own responsibility but the insurance carrier through its chief representative in America approved his action and the evidence shows that it is a common practice by all such insurance carriers throughout the country. Such solicitation of retainers for respondent may have aided him professionally and may have inured to his pecuniary benefit but I am of opinion that he was warranted in accepting the retainers and that it did not in the circumstances constitute improper soliciting of clients."

The learned referee concludes his report with the following expression of his opinion: " The practice of accepting formal retainers negotiated for an attorney by a third party who is not the client but is interested in the subject matter of the retainer and of dividing fees with an executive officer of a corporation who is an attorney and as such executive officer procures retainers for another attorney in causes of action in which his employer is interested, and of paying investigators, part of whose duty it is to advise that he be retained as an attorney, not measured by the fair and reasonable value of the services after the attorney has been so retained — are bad in principle and should be disapproved by this Court; but in view of the lack of intent of improper conduct on the part of the respondent and of all of the circumstances here presented, I am of opinion on due consideration of the entire case, that the charges should be dismissed."

With the conclusion of the learned referee as to the impropriety of the practice referred to, we agree. We cannot approve of a practice whereby a lawyer, no matter how well known he is to the officers or investigators of an insurance company, nor how much interested they may be in his professional success for sentimental or other reasons, should profit by the acts of the investigators for the insurance company in going to claimants with printed retainers made out in his name and influencing them to retain the attorney to prosecute their claims on a contingent basis. And the practice should be disapproved, even if the solicitation was by instruction from the officers of the company and for a worthy motive. The practice is a violation of the twenty-seventh Canon of Ethics, which declares that it is " unprofessional to procure business by indirection

through touters of any kind." Respondent undoubtedly knew of this practice for the three years it was followed and profited therefrom. But we cannot say that the evidence establishes that he knew of any action of the investigators for the company in offering advances as an inducement in obtaining signatures to his retainers. If we could fairly so find, we think graver action would be called for. Upon all the testimony in this proceeding, we think that the respondent should be censured for his knowledge of the systematic solicitation of retainers for him by the investigators for the assurance corporation and his acceptance of the financial benefits thereof. The abuses to which such a method of doing business would lead when an unscrupulous attorney could secure business on a large scale with the backing and through the solicitation of one or more insurance companies are apparent, and would put a premium on the callous disregard of the letter and spirit of the Canon of Ethics.

The report of the learned referee should be confirmed and the respondent censured.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent censured.