In the Matter of FREDERICK J. MIX, an Attorney, Respondent.

Fourth Department, January 15, 1937.

*Paul Folger* and *Charles S. Wilcox* for the respondent, for the motion.

*Daniel J. O'Mara, District Attorney of Monroe County,* and *Stephen K. Pollard, Assistant District Attorney,* for the petitioner, opposed.

EDGCOMB, J.  This is a disciplinary proceeding.  Respondent is charged with professional misconduct in three particulars.  The issues framed by the petition and answer have been referred to an official referee.  He has found that the evidence fails to sustain the charges, or to justify any disciplinary action by the court.  We regret to say that, after a most careful review of the evidence, we have reached an entirely different conclusion.

The first charge which has been made against the respondent relates to the so-called White loan.  On August 28, 1928, David A. White applied to the respondent for a loan of $1,500.  Mix did not have the money, and he told White he would try to get it.  He got in touch with a client of his, Joel W. Stockwell, who was accustomed to buy second mortgages at a discount, and told him that White needed $1,500 that very day, and was willing to give five per cent discount on a thirty-day note.  In answer to an inquiry as to White's financial standing, respondent replied that while it might not be of the highest, he had some growing fruit which was worth more than the amount of the note, and which he was willing to put up as collateral security for the payment of the loan.  Mix assured Stockwell that he would be willing to loan the money, if he had it. As the result of this talk, Stockwell agreed to make the loan, and gave Mix his check for $1,500, which Mix deposited in the bank to his own credit.  Mix then drew his check for $1,500, and delivered it to White.  White gave Mix his note for $1,575, due thirty days after date, and at the same time executed a chattel mortgage on approximately 1,500 bushels of peaches and 500 bushels of apples growing on a farm owned by him in Orleans county, as collateral security for the loan.  Mix indorsed the note, and delivered it to Stockwell, and at the same time assigned the chattel mortgage to him.  There is a difference of opinion between Mix and Stockwell as to whom the note was made payable.  Mix thinks that Stockwell was named as payee, while Stockwell is quite sure that the note was made payable to Mix.  The instrument was not produced on the hearing.  Stockwell did not have it for reasons which will appear later.  Every indication points to the fact that Stockwell's version is correct; otherwise the note would clearly have been tainted with usury, even if it could be claimed that it was not so contaminated if made payable to Mix and transferred by him to

Stockwell. We can hardly conceive that a lawyer of respondent's ability would knowingly place his client in a position where he would be unable to enforce collection of his loan, if the defense of usury was pleaded. The fact that the chattel mortgage was given to Mix is indicative of the fact that the note was made payable to him. Mix seeks to avoid this inference by claiming that White gave him the mortgage as security for his indorsement, but this assertion loses its force when we consider that on the very day the mortgage was given Mix assigned it to Stockwell. But it is not very material who was named as payee of the note. Stockwell loaned the money; White was primarily liable for its payment, and Mix under any theory was liable as an indorser.

Mix admits that the chattel mortgage was never filed. The reason for this neglect is not satisfactorily explained. Mix must have understood the danger which might result from such failure. He says that he would have filed the mortgage if Stockwell had so directed, notwithstanding the fact that White requested that the filing be dispensed with. Stockwell was a layman, and he was relying upon Mix's advice in making this loan; it would seem, therefore, that the responsibility of making the security for this loan as good as possible rested on Mix rather than on Stockwell.

The note was not paid at maturity. Mix attempted to collect it for Stockwell and Stockwell was in frequent communication with both White and Mix regarding its payment. The matter ran along without any payments being made until August 29, 1929, when Mix signed a demand note for $1,725, which included the entire indebtedness on the White note and further discount and gave it to Stockwell, and Stockwell surrendered the original White note.

Payments were made on the Mix note from time to time, so that on February 28, 1931, the amount due was $1,488.88. On that date Mix gave Stockwell a new note for that amount. Payments aggregating $370 have been made on this note. The balance remains unpaid. Mix has since been adjudicated a bankrupt.

In September, 1931, Mix brought an action against White, and after some delay succeeded in collecting the face of the original note, less the discount. Five hundred dollars of this money was paid in 1932, a portion in 1933, and the balance on January 9, 1934. With the exception of one payment, Mix has never turned over any of this money to Stockwell. When asked what became of it, Mix replied: " It went to the first creditor who got to my office usually."

The question before us is whether this money belonged to Stockwell, who made the loan in the first instance, or whether Mix had a right to retain it for his own use.

It must be conceded that, if this collection was made for Stockwell's benefit, Mix had no right to the money, and that he should have paid it over to Stockwell without delay.

Mix seeks to justify his conduct upon two grounds: *First*, he says that the relation of attorney and client never existed between himself and Stockwell, and that in making the loan he simply acted as a broker; *second*, he insists that whatever may have been his connection with Stockwell at the outset, the situation was changed when he gave his note to Stockwell on August 29, 1929, one year after the loan was made, and when he took over White's note; he claims that under these circumstances the affair became a simple business transaction between himself and Stockwell, and that White was out of the picture so far as Stockwell was concerned, and that any money which he collected from White was his to do with as he desired, and that he cannot be disciplined because he failed to pay his personal indebtedness, and subsequently went into bankruptcy.

Respondent's interest in this whole transaction is somewhat of a mystery, if we are to believe his testimony. He says that he was never paid by either White or Stockwell for his services in the matter. And yet he volunteered to indorse the note and to obligate himself to pay it, if White defaulted, in order to induce Stockwell to make the loan, and later he was willing to substitute his own note for White's secured obligation. Yet we are told that Mix was only a broker to bring the parties together, and that he was never paid for his services. Such conduct on respondent's part is, to put it mildly, unusual.

If we were to concede that respondent was simply acting as a broker, it would not authorize him to keep this money, if it rightfully belonged to Stockwell. A broker or agent cannot refuse to turn over money, which comes into his possession, to the rightful owner.

We reject the theory urged by respondent. The evidence clearly establishes that when this loan was made, the relation of attorney and client existed between Mix and Stockwell. Mix had represented Stockwell in similar transactions on many previous occasions. He sought out Stockwell at this time, and not only solicited the loan, but advised him as to its desirability. He attended to the details of the transaction. He later attempted to collect the note for Stockwell. Much of a lawyer's business consists in giving advice in strictly business matters, which, many times, might equally well be given by a business man, but that does not mean that the relation of attorney and client does not exist between the two.

An attorney may be disciplined for professional misconduct wholly disconnected with the discharge of his strictly legal duties.

(*Matter of Dolphin*, 240 N. Y. 89, 92, 93; *Matter of Isaacs*, 172 App. Div. 181; *Matter of Popper*, 193 id. 505.)

Neither do we think that the substitution of Mix's note for the original White note justifies the respondent in keeping the money which he collected from White. On one occasion Mix promised to turn over to Stockwell a payment which he expected White would make on his note in the near future, and he kept his promise. That was the only time, however, when he saw fit to give Stockwell the benefit of these payments.

It is unnecessary to determine here whether in retaining this money respondent is guilty of a crime, or whether he would be liable for conversion in a civil action. To warrant the court in disbarring or suspending an attorney, it is not necessary that his conduct be such as to subject him to indictment or to civil liability.

We think that under the circumstances disclosed by the record this money collected from White belonged to Stockwell, and that Mix should have turned it over to him, and that, because of his failure so to do, a good ground exists for discipline.

We now come to the second charge against the respondent. In 1929 Mr. Mix was retained by Joseph Thomas to look after his interests in an action brought against him in the City Court of Rochester by Miles F. Bixler Company to recover the purchase price of certain jewelry. On October 18, 1929, a verdict for $276.20 was entered against Thomas, and a transcript of the judgment was filed in Monroe county clerk's office on October 21, 1929, and on the same day an execution was issued to the sheriff of Monroe county. Although an appeal was taken, Thomas turned over to Mix the sum of $305 in two installments, the first on October 26, 1929, and the second two days later, out of which Mix was to pay the judgment and his own bill for services. The appeal was never argued. According to Mr. Mix's own testimony, it was taken in the hope that some sort of an adjustment could be made by returning the jewelry which had been purchased, and getting a rebate on the judgment. This was never accomplished, and, so far as the evidence discloses, was a forlorn hope from the outset.

Mix paid no part of the judgment until August 23, 1930, ten months after the receipt of the money, when he sent the sheriff his own check for fifty dollars to apply upon the execution. Thereafter he made various payments which, according to a letter written by him to the sheriff under date of July 24, 1931, aggregated $155, and which were made on sixteen different occasions between August 30, 1930, and May 5, 1931, in amounts varying from five dollars to twenty dollars.

On April 1, 1931, Thomas, through other attorneys employed by him, interviewed Mix in an endeavor to have him satisfy the Bixler judgment. The sheriff claimed that there was still due on the execution the sum of $165. Mix disputed these figures, and insisted that he had paid more to the sheriff than had been credited on the execution. He promised to make a substantial payment immediately, and agreed to take care of the entire matter by April fifteenth. How well he carried out his agreement is evidenced by the fact that he paid twenty dollars on April first, the date he made the promise, five dollars on April sixteenth, one day after he agreed to take care of the entire matter, fifteen dollars on May fifth, and forty-five dollars on July 24, 1931. There the matter rested, so far as respondent was concerned, until October 21, 1931, when he sent the sheriff a check for thirty-two dollars and fifty-one cents to satisfy the judgment in full. This last payment, however, was not made until after the sheriff had threatened to levy on Thomas' stock of goods and to close his store, and until after Thomas, through his new attorneys, had obtained an order requiring the sheriff, the attorneys for the judgment creditor, and Mix to show cause why the judgment should not be satisfied of record. This procedure proved effective and the matter was adjusted before the order to show cause was returnable.

Thus, after a delay of two years from the time in October, 1929, when the money was turned over to Mix to pay the Bixler judgment, Mix finally paid to the sheriff the full amount of the judgment. As an excuse for this long delay respondent claims that he was trying to effect a compromise of the judgment. The evidence of any *bona fide* effort on Mix's part to bring about the desired result is meager and unsatisfactory. He did talk with the attorney for the judgment creditor on several occasions soon after he received the money, and suggested that Thomas be allowed to return the jewelry, but there is nothing in the evidence which would warrant the conclusion that any vigorous effort was ever made to bring about a compromise of the judgment. On April 1, 1931, when he was interviewed by Thomas' attorney, and when he promised to pay the balance of the judgment by April sixteenth, he made no mention of any settlement of the judgment. That idea had apparently been abandoned by him at that time. He offered no excuse for retaining this money for a year and five months.

The execution had been in the hands of the sheriff all this time. Respondent made no effort to obtain a stay of execution, or to push the appeal, and during all this time he had the use of this money. There is no suggestion that he segregated and kept it separate from his own funds, or that he earmarked it in any way. In his

letter to the sheriff, listing his payments on the execution, he states that certain payments were made by checks, and others by cash. This would indicate that the payments were not made from any money set aside for that purpose.

The amount paid Mix to discharge this judgment was in the nature of a trust fund, and it should have been held by him as such. It was paid to him for a special purpose, and he was under a strict obligation to keep it separate and apart from his own funds. In failing so to do, he violated the duty which is imposed upon every attorney, and rendered himself liable to discipline. Respondent's excuses cannot be accepted to palliate his use of this money, and his failure to promptly turn it over to the person entitled to it. (*Matter of Powers*, 235 App. Div. 382, 384; *Matter of Babcock*, 230 id. 323.)

The third charge relates to the sale of a second mortgage for $3,500 to Mr. Hasentab, one of his clients. It is alleged that this sale was made without informing the purchaser that Mix was the real owner of the property, and that the record owner had no real interest in the property. The investment turned out to be a practical loss to Hasentab. As stated by the referee, the transaction is somewhat complicated and difficult to understand because of the unsatisfactory evidence, and the various people involved. We doubt if enough has been shown to justify action on this particular charge.

But some may say that the misdeeds of the respondent occurred so long ago that he should not be disciplined at this late date. There is no statute of limitations in a disciplinary proceeding. (*Matter of Leonard*, 127 App. Div. 493; affd., 193 N. Y. 655; *Matter of Simpkins*, 169 App. Div. 632.) The matters here involved were never presented to the court until now, and the age of the charges will not prevent our acting at this time.

Having reached the conclusion that the findings of the referee as to the first and second charges should be reversed, and that the respondent should be found guilty of misconduct in connection with these matters, we approach a most unpleasant subject. After much thought and deliberation we have reached the conclusion that respondent should be suspended for two years, and thereafter until the further order of the court.

The motion should be denied, and the findings of the referee as to the first two charges should be reversed, and the respondent found guilty of professional misconduct in connection with those charges. An order should be entered suspending respondent from further practice for two years, and thereafter until the further order of this court.

All concur. Present — SEARS, P. J., EDGCOMB, THOMPSON, CROSBY and LEWIS, JJ.

Report of the referee as to the first two charges reversed and charges sustained as stated in the opinion; report as to the third charge confirmed. Order entered suspending respondent from practice for a period of two years and thereafter until the further order of this court. [See 249 App. Div. 713.]