Breitel, J.
Respondents Kelly and Whalen appeal from an order of the Appellate Division suspending each respondent from the Bar for a period of two years. In a memorandum *372 decision, that court confirmed in part and rejected in part a report of the Eeferee sustaining charges of professional misconduct.
There are two principal issues. The first relates to the sufficiency of the evidence in finding respondents guilty of professional misconduct in the representation of conflicting interests (Canons of Professional Ethics, canon 6[1]). The second involves the sufficiency of the evidence in finding respondents guilty of professional misconduct in stirring up litigation (Canons of Professional Ethics, canon 28[2]). The record is insufficient to sustain the determinations. Because additional facts should be ascertained to determine whether there indeed was professional misconduct in the representation of conflicting interests, the proceeding should be remanded for further proof. The charge of stirring up litigation should be dismissed. '
There were two lesser charges sustained. The first involved the making of [1] ‘ improper ’ ’ loans to one who had referred accident cases to respondents. The other involved the improper withholding of moneys due to a physician for medical services rendered to a client in an accident case. Because the record is insufficient to sustain them, these lesser charges should also be dismissed.
Apart from the substantive issues, respondent Whalen argues that he was deprived of a speedy hearing; and both respondents argue that the compulsory disclosure by subpoena of the law firm’s records violated constitutional limitations. Both also seek a review of the two-year suspension as excessive.
On April 13, 1959, the Appellate Division, Second Department, on the petition of the Nassau County Bar Association, authorized a judicial inquiry into the conduct of lawyers in Nassau County. After an extensive investigation with hearings before a Supreme Court Justice, he recommended, on January 4, 1963, that disciplinary proceedings be instituted against respondents Kelly and Whalen. The Appellate Division, on January 9, 1963, designated petitioner, the Honorable Samuel Greason, to begin these proceedings, which he did by petition and order to show cause dated February 4, 1963.
*373 The charges set forth in paragraph 7 of the petition were as follows:
“ (A) The respondents have submitted fraudulent and exaggerated lost earnings statements to insurance companies in connection with claims for special damage in negligence claims.
# # #
“ (B) Respondents, Kelly and Whalen have accepted referrals of claimants with resultant conflict of interest: (i) from adjusters and other employees of insurance companies, which companies had employed either one or the other of the respondents as adjusters; and (ii) from brokers, agents and assureds of insurance companies, which companies had employed either one or the other of the respondents.
# * *
“ Respondents also accepted referrals of claimants in negligence claims, which claimants were insured by Nationwide Insurance Company, although respondent, John P. Whalen, was working for Nationwide Insurance Company as an adjuster.
* * *
“(C) The respondents, Kelly and Whalen, have submitted inflated and built-up medical bills to insurance companies.
# # *
“(D) Respondents have withheld payment of medical bills.
# * *
“ (E) Respondents have made loans to clients in negligence suits and also to referrers.
* # *
“ (F) The respondents have benefitted by the stirring up of litigation through referrals by auto repairmen, insurance agents and brokers.”
Hearings, held between September 17, 1965 and January 7, 1966 before a Special Referee, culminated in the submission of a report and findings on May 1,1967.
As to specification A (fraudulent claims), the report sustained the charge against Kelly with respect to one client, but dismissed the charge against Whalen. Specification B (conflict of interest) was sustained against both respondents. Specification C *374 (inflated bills) was dismissed against both respondents. Specification D (withholding payments) was sustained against Kelly with regard to a bill for medical services and dismissed against Whalen. Specification E (loans to referrers) was sustained against Whalen concerning loans to one Chicavich and dismissed against Kelly. Specification F (stirring up litigation) was .sustained against both respondents, the Referee resting his conclusion on his earlier finding that Whalen had made the loans to Chicavich, one of the referrers, as a “ gratuity ” or splitting of fees.
The Appellate Division confirmed the report with the exception of specification A (fraudulent claims), which that court found was not sustained by the evidence. In directing the two-year suspension, the court stated, ‘ ‘ With respect to the extent of the discipline to be imposed, we have been largely influenced by charges B and F, which reflect patterned conduct and not isolated instances of misconduct.” (29 A D 2d 651, 652.)
The two principal charges will be considered first.
I. Specification B (Conflict of Interest)
The two lawyers, Kelly and Whalen, after having shared office •space for several months, entered into a law partnership by oral agreement in 1958. Whalen was then employed as an insurance adjuster for Nationwide Insurance Company, a position he held until 1962. Under the partnership arrangement, Kelly first drew funds equivalent to the salary Whalen was receiving from Nationwide, and any additional income was shared equally.
William Buckley, the district office claims manager for Nationwide and Whalen’s supervisor from 1959 to 1962, testified that Whalen was an outside adjuster, that is, he received assignments of claims by mail, did whatever investigation and interviewing was required, and then reported by mail. Whalen, he said, had no access to any Nationwide files other than those of claims assigned to him.
Neither lawyer denies that the partnership handled matters for assureds of Nationwide referred to them by Nationwide employees or independent brokers. These were claims for medical payments under the carrier’s policies. With one possible exception, no negligence liability claims against Nationwide for such assureds were ever handled by them. Both lawyers testi *375 fied that, when an assured was referred to them by a Nationwide employee, they first ascertained whether there was any negligence liability claim against the carrier before they would handle the matter.- However, several negligence liability claims against Nationwide were handled for claimants who had been referred by automobile repairmen and others not associated with Nationwide.
In only two instances was Whalen, as adjuster, assigned by Nationwide to claims instituted by the partnership. In one case the claim was reassigned to a different adjuster; in the second, a claim for medical payments under the insurance policy, Whalen negotiated a settlement which was approved by his superiors.
Virtually all filed retainer statements on claims for Nationwide assureds were attributed to Kelly and Whalen as law partners. On the other hand, the pleadings and correspondence for these matters were uniformly subscribed by Kelly alone as attorney, as were the filed closing statements. Nationwide employees, including the district office claims manager, in their testimony, agreed that Nationwide placed no restrictions on the outside practice of law by its employees and that they were aware, at the very least, that Whalen was engaged in the practice as a plaintiff’s attorney. These employees also testified that they had been aware that Whalen practiced with Kelly, and that the partnership handled claims against Nationwide. Both lawyers testified that the carrier had full knowledge of Whalen’s activities. And Kelly testified that he had asked other lawyers about the impropriety of respondents’ conduct and, with their advice, had concluded there was none.
Petitioner offered no proof that any of the Nationwide settlements were unreasonable or unfair to either the carrier or its assureds. Neither did he show that there was any prejudice to a Nationwide assured by the partnership’s failure to bring a negligence liability claim against the carrier. Kelly and Whalen also testified that they received no fees for the processing of medical payment claims against Nationwide.
The representation of conflicting or adverse interests may constitute professional misconduct because a lawyer, as one in a confidential relationship and as any fiduciary, is charged with a high degree of undivided loyalty to his client (Matter of Mahan, 237 App. Div. 664, 666; People v. Peoples Trust Co., 180 App. *376 Div. 494, 496; 3 N. Y. Jur., Attorney and Client, §74; 7 C. J. S., Attorney and Client, § 125, p. 957; cf. City Bank Farmers Trust Co. v. Cannon, 291 N. Y. 125,131-132). Thus, with rare and conditional exceptions, the lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship (Eisemann v. Hazard, 218 N. Y. 155, 159; Matter of Tevlin, 250 App. Div. 685, 687-688; 7 C. J. S., Attorney and Client, § 47; see Matter of Sociedad Maritima [Pangalante Co.], 21 A D 2d 43, 45; cf. City Bank Farmers Trust Co. v. Gannon, 291 N. Y. 125, 132, supra). In the exceptional situations where representation may be permissible,.despite a potential and sometimes even an actual conflict of interest, the lawyer must, at the very least, disclose to all affected parties the nature and extent of the conflict and obtain their consent to the continued representation (Moller v. Pickard, 232 N. Y. 271, 274; Matter of Sale, 248 App. Div. 402; Canons of Professional Ethics, canon 6; 7 C. J. S., Attorney and Client, § 47, pp. 826-827, § 125, pp. 958-959; Ann., Attorneys — Conflicting Interests, 17 ADR 3d 835, 838-841).
Potentially, a claimant against an insurance company is adverse in interest to the carrier, which would most often seek to minimize any liability. Thus, it was, prima facie, evidence of professional misconduct for the partnership to represent claimants, whether assureds of Nationwide or not, in their claims against the carrier,, while at the same time Whalen was also the carrier’s employee (see Matter of Paders, 250 App. Div. 418, 420; Matter of Cherry, 228 App. Div. 458, 460-462; Loew v. Gillespie, 90 Misc. 616, 620; New York County Lawyers’ Committee, Opinion No. 279, cited in Drinker, Legal Ethics, p. 108, n. 5; Decisions by the American Bar Association Committee, No. 289, cited in Drinker, id., p. 298).
Under such circumstances the lawyers were obliged to come forward and dispel the apparent impropriety by showing prior full disclosure to and consent by the parties (Moller v. Pickard, 232 N. Y. 271, 274, supra; Matter of Fieldsteel, 228 App. Div. 470, 477; cf. Matter of Marino, 20 N Y 2d 176, 178; Matter of Horovitz, 228 App. Div. 484, 489; see Matter of Putnam, 257 N. Y. 140,143; 24 N. Y. Jur., Fraud and Deceit, § 278, p. 360; 7 C. J. S., Attorney and Client, § 33, pp. 780-781; see, also, Ann., Propriety *377 and Effect of Attorney [Representing Interest Adverse to That of Former Client, 52 ALB 2d 1243, 1268-1276). Petitioner concedes, arguendo, that full disclosure was made to Nationwide, a concession fully supported by the record. But he points out that there was no evidence that there had been disclosure to the clients, let ..alone consent to the conflicting representation. In the absence of such a justification, the Beferee and Appellate Division would, ordinarily, be entitled to conclude that such representation constituted professional misconduct (see Matter of Rondel, 158 N. Y. 216, 219; Matter of O’Doherty, 14 A D 2d 4, 8; Matter of Wysell, 10 A D 2d 199, 202; Matter of Lynch, 227 App. Div. 477, 479-480).
In response, the lawyers assert that they offered no evidence of disclosure to their clients since the “ thrust of [the charge] was that there was a conflict of interest vis a vis Bespondents and Nationwide ; not inter se Respondents and their clients! ” They argue that only Nationwide, to whom full disclosure was made, could have been prejudiced. This is hardly so, since loyalty to Nationwide, and concern for Whalen’s continued employment by the carrier, could have influenced the effectiveness and vigor with which claims against the carrier were prosecuted. The language, however, of specification B, by placing emphasis upon Whalen’s duties to Nationwide, rather than the partnership’s duties to their clients, could have misled respondents. More important, although petitioner questioned Nationwide employees extensively as to whether Nationwide knew of Whalen’s participation in claims against the carrier, he made no similar inquiry of the clients who appeared as witnesses. Hence, the lawyers might have assumed, as they argue they did, that disclosure to the clients was not made a relevant issue. (Of course, once the issue is recognized, petitioner does not have the burden either of going forward or of proving more than the conflict of interest.) Respondents, in discussing the issue as one of burden of proof, contend only indirectly that full disclosure was made to their clients. But in view of their assertion that they were misled, and the likelihood that they were, the proceeding should be remanded to enable the lawyers to show that full disclosure was indeed made to their clients, and consent obtained, if that was the case.
*378 On remand, there may well be other dependent issues. Even if there were disclosure to and consent by the clients as well as the insurance company, the circumstances, when fully developed, may indicate an impermissible actual conflict. Canon 6 expresses, the general policy that a client who is made fully cognizant of potential (or, occasionally, actual) conflicts, is entitled to take his chances. But in some instances, because the relationships or interests create a substantial likelihood of profound conflict, or for other policy reasons, representation is not permitted under any circumstances.[3]
Thus, where a lawyer represents parties whose interests conflict as to the particular subject matter, the likelihood of prejudice to one party may be so great that misconduct will be found despite disclosure and consent (see Ann., Attorneys — Conflicting Interests, 17 ALR, 3d 835, 843-849, supra; Matter of Sale, 248 App. Div. 402, 405, supra; Matter of Gilchrist, 208 App. Div. 497).
Similarly, there are other particular situations where the circumstances establish such delicate conflicting relationships and inescapable divided loyalties that the likelihood alone of improper conduct or motivation, without any showing of harm and regardless of disclosure and consent, may give rise to professional misconduct. Where divided loyalties exist, a lawyer may inadvertently, and despite the best of motives, be influenced and act detrimentally to the client, or the appearance of misconduct will be unavoidable (Matter of Cherry, 228 App. Div. 458, 461, supra; see, also, Matter of Bovard, 228 App. Div. 263, 269; cf. City Bank Farmers Trust Co. v. Cannon, 291 N. Y. 125, 130, supra). Moreover, the unsophisticated client, relying upon the confidential relationship with his lawyer, may not be regarded as able to understand the ramifications of the conflict, however much explained to him (Matter of Young, 188 App. Div. 538, 542-544).
On a remand, as the facts are developed, if it should appear that Whalen’s relationship to Nationwide as its adjuster was such that, even as to claims not assigned to him, he was charged *379 with a duty to protect its interest, there would be no effective consent by the clients. Similarly, there would be no effective consent if it should appear that Whalen’s employment with Nationwide would necessarily affect the partnership’s vigor in pursuing claims against it on behalf of claimants. Because there was no evidence and no direct issue raised as to disclosure to and consent by the clients, there was no opportunity to explore or consider any dependent factors that might render disclosure and consent immaterial. For all these reasons, a remand of the proceedings is desirable.
II. Specification F (Stirring up Litigation)
The record established that a number of cases were referred to the partnership by insurance agents, brokers, adjusters, and automobile repairmen. Of the seven different referrers named in the specifications, John Chicavieh, automobile repairman, referred seven claims (one his own) over a period of seven months; Harry Hoagland, automobile repairman, referred nine cases over nine months; Charles DeMarco, automobile repairman, referred four cases to Kelly over two years (only two of them after the partnership was formed); Bernard Boomer, a policeman and insurance broker, referred eleven cases over 19 months; Robert Worst, claims adjuster, referred two cases; Thomas Dowling, claims adjuster, referred three cases; Aaron Bien, insurance broker, referred three cases. Bach of these men was either a personal friend or a business associate of one of the two partners.
There was no evidence that the referrers had done anything more than answer requests for a recommendation made by victims of automobile accidents. There was no showing that the referrers distributed business cards of the partners, arranged appointments for respondents, or did any other acts of .affirmative or officious solicitation. There was no showing that any of the claims referred lacked merit. It is not unusual for automobile repairmen or insurance brokers to have legitimate occasions for recommending a lawyer. Moreover, it is to be expected that Kelly and Whalen would have several friends or acquaintances in strategic positions to make recommendations, without a prearranged system for referral and without affirmative or officious acts of solicitation, since one or the other was or had been in the *380 casualty business. The acceptance of numbers of cases referred by acquaintances is not, without more, professional misconduct (Matter of Kreisel, 21 A D 2d 431, 433; People v. Schneider, 20 A D 2d 408, 411; Matter of Schlacht, 228 App. Div. 226, 231-232). In addition, the number of questioned referrals, in bulk or from any one source, was not so inordinately large as to create ah inescapable circumstantial inference that they were obtained as the result of prearrangement, compensation, or affirmative or officious solicitation (see Matter of Marino, 20 N Y 2d 176, 178, supra; People v. Schneider, supra; Platter of Shufer, 12 A D 2d 208, 210-212, mot. for lv. to app. den. 9 N Y 2d 611).
Nor was there other direct or circumstantial evidence that the lawyers gave any consideration for the referrals, whether in money or otherwise (see Matter of Shufer, supra, p. 211).
One of the referrers, Mr. Dowling, an adjuster for Nationwide, was employed occasionally by the partnership to do investigations. But there was no indication that the payments to him (approximately $300 for 30 cases) were excessive or disproportionate to the investigative services performed (see Matter of Bovard, 228 App. Div. 263, 268, supra; Matter of Schacht, 228 App. Div. 232, 239). Whalen, it is true, recommended several people to De Marco for automobile repair work, and two or three others to Boomer as insurance “leads ”. But, in view of the long-standing friendships between Whalen and both De Marco and Boomer, these few cross recommendations cannot, without more, be regarded as consideration for the referrals made by De Marco and Boomer to the lawyers.
The Referee, in concluding that this specification had been established, stated, resorting to the language of the specification: “ The inferences I draw from the evidence are that Mr. Kelly and Mr. Whalen when they formed their partnership planned and expected to profit by such referrals, and that they did profit thereby.” Of course, this was indisputably true and the lawyers did not seriously contend otherwise. But except for the loans to Chicavich, about to be discussed, there is no other finding or evidence of solicitation by prearrangement or the giving of consideration for the referrals, without which such referrals and the expectation to profit thereby is not wrongful conduct. Indeed, in this context to “ plan ” and “ expect ” conveys no culpability.
The Referee seemed to base his findings under this specifica *381 tion on loans made by Whalen to Chicavich, which he inferred involved a sharing of fees or other improper consideration. Since Kelly was absolved of any knowledge of these loans, they cannot, as an isolated matter, be used as the basis for finding, as to Kelly, that he was or should have been aware that referrals were being made for a consideration. And as will be seen shortly, such an inference, even as to Whalen, cannot be supported. Hence, this finding, as an underpinning for this charge against Whalen, also fails.
There was, therefore, insufficient evidence to support the finding that respondents had improperly solicited cases or stirred up litigation, and specification F should be dismissed.
The lesser charges will now be considered.
IH. Specification E (Improper Loans)
As noted, all the charges of improper loans, except those to Chicavich, were dismissed by the Referee, and the Appellate Division in this respect followed the report.
John Chicavich, testifying in April, 1962, stated that the previous year, when he had started a new business, Whalen had lent him $200 to meet his payroll, and several months later had lent him another $800. He also testified that the money had been repaid about a month before he testified (that is, March, 1962). Whalen, testifying in 1966, confirmed that he had lent the two sums to Chicavich, as an old friend, to help him in his new business. He testified, however, that the business was started in 1962, rather than 1961. Petitioner points out that the testimony is inconsistent, since the money had been loaned and repaid, according to Chicavich’s testimony, before it was lent, according to Whalen’s testimony.
Chicavich had, undisputedly, started a new business. The inconsistency arose only because Whalen testified (in 1966) that the business was started in 1962, rather than 1961. It is only reasonable to regard the inconsistency between the two men as a confusion caused by the passage of time, rather than as a product of intentional falsehood.
Thus, the finding that the loans were a consideration for referrals is not supported and specification E should be dismissed.
*382 IV. Specification D (Withholding Payments)
Kelly represented one Edna Marrs in an automobile negligence action which was eventually settled for $1,675. The closing statement showed that the attorney’s fee was $675 and that a medical bill of $150 (to a Dr. Coren) was charged against Mrs. Marrs. In fact, the bill was never paid. The settlement proceeds were actually used to pay Kelly’s fee in the negligence action and to pay certain expenses, including a $400 legal fee to Kelly, in connection with the closing of the sale of Mrs. Marrs ’ house, which took place the day the settlement proceeds were distributed. Mrs. Marrs received approximately $75 in cash from the settlement.
Kelly admits that the closing statement was erroneous and that Dr. Coren’s bill was not paid from the settlement proceeds. He explains that when the closing statement was originally drawn he expected to use the settlement proceeds to pay the physician, but that unanticipated expenses arose in connection with the real estate closing, for which part of the settlement proceeds were used. Carelessly, he failed to revise the closing statement and the original draft was used by his office staff to prepare the statement eventually filed.
The physician’s bill was for services rendered in treating Mrs. Marrs at his office. Although the physician saw her shortly after Kelly was retained by Mrs. Marrs, she was not referred to Dr. Coren by Kelly, but rather by her sister. Dr. Coren testified that he submitted several bills to Mrs. Marrs and also forwarded copies to Kelly. It was agreed by petitioner and respondents that the physician held no lien. The physician did not testify to any understanding with Kelly as to payment of his bill, nor was there any evidence of an assignment by Mrs. Marrs to the physician. Kelly testified that he knew of no assignment, and, of course, had made no promise to Dr. Coren to pay the bill. Kelly’s knowledge that there was an outstanding bill for medical services did not charge him with a responsibility for its payment out of the proceeds or otherwise (Aiello v. Levine, 44 Misc 2d 1067, 1068; cf. Brinkman v. Moskowitz, 38 Misc 2d 950; see Ann., Attorneys —Liability for Expenses, 15 ALR 3d 531).
To be sure, if Kelly had not used a portion of the proceeds to pay his own legal fees in connection with the negligence action *383 and the real estate closing, Dr. Coren might have been in a better position to obtain his fees from the proceeds. But, as has been seen, Kelly was under no legal obligation to ensure payment of Dr. Coren’s bill and had undertaken no legal obligation to assist Dr. Coren in obtaining payment from Mrs. Marrs (cf. Zengerle v. Weiss, 48 Misc 2d 271, 274). Moreover, there is no contention or indication that the fee of $400 for handling the closing was unreasonable, excessive, or fraudulent.
Thus the charge of professional misconduct can rest, ultimately, only on the filing of the inaccurate closing statement. The mistake, under the uncontradicted testimony, was unintentional, although careless, and as an isolated inadvertence should not constitute professional misconduct.
On this view specification D should be dismissed.
V. Constitutional Claims
Although Whalen argues that the proceedings were unreasonably protracted, this complaint is hardly justified. Disciplinary proceedings are generally pursued at a cautious pace, because of the serious effects upon practitioners. Since the proceedings are not public, the effect of their prosecution is controlled. The five years that passed from the filing of charges until the Appellate Division order of suspension, although undesirable, are not inordinate as these matters go. Moreover, much of the delay was due to Whalen himself in obtaining adjournments. Of course, for this purpose there is no proper parallel to criminal proceedings. This is not to say, and the issue is not passed upon now, that if charges should become stale through the passage of time and extended periods of inaction, there would be no bar to further prosecution of them (see Drinker, Legal Ethics, pp. 37-38, 47, supra; cf. Matter of Simpkins, 169 App. Div. 632, 635; but see, also, Matter of Mix, 249 App. Div. 442, 448, revd. on other grounds 274 N. Y. 183).
Finally, respondents’ argument that the compelled disclosure of their files to the judicial inquiry prior to the filing of formal charges violated their constitutional rights is without merit. Spevack v. Klein (385 U. S. 511), overruling Cohen v. Hurley (366 U. S. 117), held that a lawyer may not be disbarred merely for invoking his privilege against self incrimination during dis *384 ciplinhry proceedings (385 U. S., p. 514). However, Mr. Justice DotiotAS, for the majority, carefully indicated that although the Appellate ¡Division had assumed that the self incrimination privilege attached to the lawyer’s records, the Supreme Court was not so deciding (385 U. S., pp. 517-518, concurring opn. by Fortas, J., p. 520). The question thus left open has been decided for this Court in Matter of Zuckerman (20 N Y 2d 430). It was held that there was no privilege against malting disclosure of matters otherwise involving criminal responsibility if ££ usable only in a disciplinary proceeding ” (20 N Y 2d, p. 438). This Court pointed out that neither lawyer had invoked any privilege but rather had made the disclosure requested. It refused to speculate whether the lawyers had chosen to subject themselves willingly to the supervisory and corrective powers of the Appellate ¡Division or had been motivated by the state of the law at the time of the disciplinary proceedings, before the Spenack decision.
There is no distinction between this and the Zuckerman case. Respondents claim that the Zuckerman rule was based on the premise that the lawyers there were not exposed to punishment for crime, whereas the misconduct charged against respondents in this case constituted criminal conduct as well. But the charges in the Zuckerman case could have resulted in criminal prosecutions for larceny and barratry.
Respondents also rely on the recent case of Matter of Ruffalo (390 U. S. 544), arguing that the Ruff alo case destroyed any distinctions between disciplinary proceedings and criminal proceedings for the purpose of applying the privilege against self incrimination. The Ruff alo case holds only that since disciplinary proceedings are .adversary proceedings of a u quasi-criminal ’ ’ nature, due process requires that there be notice of the disciplinary charges before the proceedings are begun (390 U. S., p. 551). The case, therefore, hardly stands for an equation of criminal and disciplinary proceedings, a most unlikely view.
Respondents finally contend that the two-year suspension waS excessive, but this Court has declined to review the extent of a disciplinary sanction (Cohen and Karger, Powers of the New York Court of Appeals, § 108, pp. 452-453; see, e.g., Matter of Rosenthal, 276 N. Y. 676; Matter of Axtell, 257 N. Y. 210; Matter of Hawes, 217 N. Y. 602). In any event, in view of the recom *385 mended, disposition of these proceedings the question is moot. Accordingly, the order of the Appellate Division should be modified, without costs, by vacating the suspension, dismissing specifications D, E, and E, and remanding the proceedings for a new or additional hearing, as the Appellate Division may direct, for further consideration of specification B and the sanction to be imposed, if the specification be sustained.
tihief Judge Etilo and Judges Burke, Botleppt, Bbbgan, Beamng and Jasen concur.
Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.

. Canons of Professional Ethics, adopted 1909 by N. Y. State Bar Assn.

. Canons of Professional Ethics, adopted 1909 by N. Y. State Bar Assn., as last amd. 1928.

. This is true, for example, where the public interest is involved (Matter of A. & B., 44 N. J. 331; see Ann., Attorneys — Conflicting Interests, 17 ALR 3d 835, 850-854, supra; see, also, Matter of Koch, 276 App. Div. 36).