[L.A. Nos. 29855, 29935. In Bank. July 25, 1972.]

ARTHUR S. BLACK, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

678

## COUNSEL

Phill Silver for Petitioner.

F. LaMar Forshee, Ronald W. Stovitz and Christopher M. Reuss for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California in L.A. 29855 that Arthur S. Black be suspended from the practice of law for three months[1] and its recommendation in L.A. 29935 that he be suspended for three months in addition to any imposed in L.A. 29855.[2]

The two proceedings were heard by different local committees and were argued at different times before the board. It is appropriate, however, for us to consider the two proceedings together. (Cf. *Cutler* v. *State Bar*, 71 Cal.2d 241, 243 [78 Cal.Rptr. 172, 455 P.2d 108].)

Petitioner was admitted to practice in 1962. In both proceedings he was charged in a notice to show cause with violating his oath and duties as an attorney (Bus. & Prof. Code, §§ 6103, 6067, & 6068), wilfully

[1]Eleven members so recommended. One voted "No" on the ground that the discipline was too severe. The local committee recommended two years' suspension.

[2]Nine members so recommended. Two voted "No" on the ground that the discipline was insufficient. The local committee recommended public reproval.

violating rule 9 of the Rules of Professional Conduct,[3] and committing acts involving moral turpitude (Bus. & Prof. Code, § 6106). In one of the proceedings (L.A. 29855) he was also charged with wilfully violating rule 7 of the Rules of Professional Conduct,[4] and in that proceeding it was charged in particular that he wrongfully loaned $10,000 belonging to the Turrentine estate for which he was the attorney to other clients without the administratrix' approval and without any authority and thereby represented conflicting interests (count 1), that in making such loans he intentionally converted to his own purposes $10,000 belonging to his client (count 2), and that he misrepresented to the administratrix that he was required by law and the State Bar to invest at least one-third of the estate and based on this misrepresentation obtained her consent to the investment of one-third of the estate, and thereafter, contrary to her instructions, failed to invest in any proper estate investment and instead loaned the entire $10,000 to other clients (count 3).

In the other proceeding (L.A. 29935) it was charged in particular that a trust account of petitioner into which he deposited a settlement check of a client, Patricia Brown, contained insufficient funds during a period of over two weeks to cover the amount owed her, that he issued a check to her that was dishonored when presented for payment, and that he wrongfully converted $817 belonging to her. He denied the charges in both proceedings.

### I. *L.A. 29855*

#### A. *The Facts*[5]

In June 1966 petitioner was retained by Mrs. Lorraine Washington to probate the estate of her deceased brother, Harold Turrentine. Mrs. Washington was thereafter made administratrix of the estate, the sole asset of which was a $10,000 insurance policy. In August 1966 petitioner received a $10,000 check representing proceeds of the policy and after securing Mrs. Washington's endorsement on the check deposited it in a trust account.

---

[3]Rule 9 provides: ". . . Unless the client otherwise directs in writing, [a member of the State Bar] shall promptly deposit his client's funds in . . . a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account', or words of similar import. . . ."

[4]Rule 7 provides: "A member of the State Bar shall not represent conflicting interests, except with the consent of all parties concerned."

[5]The facts are shown by evidence, stipulations, or the superior court record in the Turrentine estate matter, of which we may take judicial notice (Evid. Code, §§ 452 & 459; see *Lee* v. *State Bar,* 2 Cal.3d 927, 941 [88 Cal.Rptr. 361, 472 P.2d 449]).

In September and October 1966 petitioner loaned money of the estate ($3,847.73 and $600) to Mrs. Barbara Heard, a friend of petitioner and a client of his in a personal injury action. From September through December 1966 he loaned the balance of the insurance proceeds to Samuel Goldberg, another friend and client of petitioner.[6] He did not obtain from Goldberg or Mrs. Heard a promissory note or other document signed by the borrower evidencing the obligation. There is evidence that he maintained records pertaining to the loans, which records, according to his testimony, he destroyed.[7] The time within which any creditors of the estate could file their claims had not expired when he made the loans.

Petitioner did not seek approval of the loans from the probate court. The evidence is conflicting as to whether the administratrix agreed to the loans and whether he made the alleged misrepresentation to her.

Mrs. Washington testified: Sometime after the check was received by petitioner he told her it was the law and a requirement of the State Bar that one-third of the estate be invested, and she replied, "if that's the law . . . go ahead."[8] She never authorized him to invest more than one-third. He did not tell her the type of investment he intended to make and never asked her permission to loan one-third of the money to clients.

Petitioner testified: During a telephone conversation with Mrs. Washington several weeks after the check was deposited in the trust account he asked her permission to lend the money to two clients of his and stated that they would be willing to pay the bank rate of interest for a loan and that he would guarantee the loans, and she stated for him to go ahead. She had theretofore said she was not interested in savings institutions because they did not pay enough interest. The only thing he discussed with her "regarding one-third" was the amount of his attorney fees from the sale of some Utah property.[9] He believed the loans were proper because he had the authoriza-

---

[6]According to Goldberg, he could not borrow from a bank because his credit was not good.

[7]Petitioner testified that he prepared three confessions of judgment in favor of the estate relating to the loan transactions, which documents he signed and kept in his files, but that he destroyed one of the documents in 1968 and the other two "Before April 10, 1969 . . . somewhere around there." He was served with the notice to show cause in the instant proceeding in February 1969. He stated that he also kept "sort of a running sheet with Goldberg" showing the amounts paid out and received, and Goldberg testified that petitioner kept a record of the payments, which they would both initial. According to petitioner, that record was also destroyed.

[8]Her testimony reflected uncertainty as to the date of the conversation. She testified that the conversation was in the "Spring of '67," thereafter stated it was "[b]etween August and November of '67," and later stated it was in the "Fall of '66."

[9]Mrs. Washington testified that she discussed legal matters involving Utah property with the petitioner in 1967 and that she did not remember him telling her the legal fee would usually be one-third but that he could have done so.

tion of the administratrix, who had told him she was the sole heir.[10] In 1966 he had been in practice only four years, did mainly criminal law, and had not handled any probate before the Turrentine estate, although he had made appearances in estate matters for a former associate.

In November 1968 Lee Freeman was substituted as the attorney for the administratrix, and about the same time he made a demand upon petitioner to account for the estate assets. Petitioner then had on hand in a savings account $4,100.50 plus interest belonging to the estate, but he did not render a complete accounting or turn over the funds to the administratrix until April 18, 1969, at which time the funds due the estate were accounted for by the delivery of a savings and loan passbook which reflected a balance of $10,939.31. Before April 18, 1969, petitioner knew that the administratrix had filed a complaint with the State Bar and petitioner had been cited in the probate proceeding to show cause why he should not, among other things, deliver to the administratrix the insurance policy proceeds.

### B. *The Findings*

The board and local committee found in essence that petitioner loaned money belonging to the estate for which he was the attorney to other clients without the approval of the administratrix or the probate court; in making such use of the estate funds he wilfully represented conflicting interests without making an adequate disclosure of all pertinent facts to the parties involved; he falsely advised the administratrix that he was required to invest one-third of the estate funds; and he wilfully violated his duties as an attorney in making improper and unsafe investments of the estate funds.

### C. *Whether Evidence Sustains Findings*

With respect to the scope of our review we recently stated in *Himmel* v. *State Bar,* 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993], "Findings by the local committee and the Disciplinary Board are not binding on this court, and we will weigh the evidence and pass upon its sufficiency. All reasonable doubts will be resolved in favor of the accused and if equally reasonable inferences may be drawn from a proven fact, the inference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted. [Citations.]

---

[10]The petition for letters of administration filed in July 1966 lists as the decedent's. immediate beneficiaries not only his sister, Mrs. Washington, but also a brother, whose address was unknown.

"The findings, however, must be given great weight, and 'When the findings . . . rest primarily on testimonial evidence, we are reluctant to reverse the decision of the local administrative committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. [Citations.]' [Citations.] The burden is on the petitioner to show that the findings are not supported by the evidence or that the recommendation is erroneous. [Citations.] In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty. [Citations.]"

■ Here petitioner contends, without elaboration, that "The findings . . . are not supported by but are contrary to the evidence." This allegation does not sustain his burden of showing that the action of the board is erroneous or unlawful. (Bus. & Prof. Code, § 6083, subd. (c); *Simmons* v. *State Bar,* 70 Cal.2d 361, 364-365 [74 Cal.Rptr. 915, 450 P.2d 291]; *Hyland* v. *State Bar,* 59 Cal.2d 765, 767 [31 Cal.Rptr. 329, 382 P.2d 369].)

■ Furthermore the recited evidence supports the findings. Although petitioner's testimony conflicted with that of Mrs. Washington as to whether she agreed to the loans and whether he made the alleged misrepresentation to her, the local committee was in a better position than this court to resolve the conflict.

### D. *Asserted Violation of Petitioner's Privilege Against Self-Incrimination*

Petitioner contends that at the State Bar proceedings his privilege against self-incrimination was violated. (U.S. Const., Amends. 5 & 14; Cal. Const., art. I, § 13.) At the local committee hearing the State Bar called him as a witness. Immediately after he was sworn the committee chairman told him ". . . if you have any reason to raise any constitutional or other objections about testifying . . . we would entertain that, otherwise we would be happy to have your testimony." Petitioner replied, "I have nothing to hide," and his attorney stated "No objections." Petitioner then proceeded to testify to his version of the facts. Later during the hearing the State Bar indicated it wanted to recall him as a witness. Petitioner objected on the ground that the State Bar "has not rested [its] case" and that the State Bar's "seesawing back and forth between one of [its] witnesses" and the "opposition" was denying him a fair trial. The objection was overruled, and he was told he would "be called to the stand unless he wishe[d] to invoke some type of privilege." He thereupon proceeded to testify and did not object to any question on the ground his answer would tend to incriminate him. At the

proceeding before the board after the local committee made its findings, which were unfavorable to him, he argued, as he does now, that there was a violation of his privilege against self-incrimination.

It is petitioner's position that the State Bar's calling him as a witness violated his privilege against self-incrimination and that he had a right to receive an admonition "that he did not have to be sworn [or] testify" and "that . . . his refusal to be sworn or . . . testify could not be used against him. . . ." The State Bar's position is that petitioner had no privilege to refuse to be sworn; that, although he could have declined to answer questions on the ground his answers would tend to incriminate him, he did not do so; and that "[i]n answering questions . . . [he] purposely waived any claim of privilege in order to . . . mitigate . . . the evidence against him."

The Fifth Amendment of the federal Constitution provides: "No person . . . shall be compelled in *any criminal case* to be a witness against himself, . . ." (Italics added.) This provision is made applicable to the states by the Fourteenth Amendment. (*Malloy* v. *Hogan,* 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489].) Article I, section 13, of the California Constitution contains a substantially identical provision.

The availability of the privilege, of course, "does not turn upon the type proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure it invites." (*In re Gault,* 387 U.S. 1, 49 [18 L.Ed.2d 527, 558, 87 S.Ct. 1428]; in accord, *Ex parte Clarke,* 103 Cal. 352, 354 [37 P. 230].) " 'The privilege can be claimed in *any proceeding,* be it criminal or civil, administrative or judicial, investigatory or adjudicatory . . . it protects *any disclosures* which the witness may reasonably apprehend *could be used in a criminal prosecution or which could lead to other evidence that might be so used.*' [Fn. omitted.] (Emphasis added.)" (*In re Gault, supra,* at pp. 47-48 [18 L.Ed.2d at pp. 557-558], quoting from conc. opn. by Justice White in *Murphy* v. *Waterfront Comm'n.,* 378 U.S. 52, 94 [12 L.Ed.2d 678, 704, 84 S.Ct. 1594].)

■ The privilege protects an accused in a *criminal case* from being called to the stand as a witness and testifying (*United States* v. *Echeles,* 352 F.2d 892, 897; *United States* v. *Housing Foundation of America,* 176 F.2d 665, 666; *People* v. *Whelchel,* 255 Cal.App.2d 455, 460 [63 Cal. Rptr. 258]; *Killpatrick* v. *Superior Court,* 153 Cal.App.2d 146, 149-150 [314 P.2d 164]; see Evid. Code, § 930), and any person from being required to give answers that will subject him to *criminal prosecution* (*Malloy* v. *Hogan, supra,* 378 U.S. 1, 11-14 [12 L.Ed.2d 653, 661-663]; *Counselman* v. *Hitchcock,* 142 U.S. 547, 562 [35 L.Ed. 1110, 1113-1114, 12

S.Ct. 195]; *Ex parte Clarke, supra,* 103 Cal. 352, 354; see Evid. Code, § 940; Witkin, Cal. Evidence (2d ed. 1966) p. 828).[11]

With respect to our state constitutional privilege against self-incrimination, it has been held that an attorney against whom a disciplinary proceeding is brought does not have the complete immunity from testifying of the defendant in a criminal case; he may be compelled to testify but may refuse to answer questions on the ground that his testimony would "tend to incriminate him." *(Fish* v. *The State Bar,* 214 Cal. 215, 222-223 [4 P.2d 937]; *McIntosh* v. *The State Bar,* 211 Cal. 261, 262-263 [294 P. 1067]; *In re Vaughan,* 189 Cal. 491, 496-497 [209 P. 353, 24 A.L.R. 858]; see Witkin, Cal. Evidence, *supra,* p. 836.) By the quoted phrase the court evidently meant "tend to establish criminal liability." In *Johnson* v. *State Bar,* 4 Cal.2d 744, 752 [52 P.2d 928] this court stated, "It has frequently been held that a member of the profession may be called upon to testify, even though such testimony may establish his violation of his oath of office and his duty as an attorney at law." (See also McCormick on Evidence (1954) p. 268, fn. 4; 8 Wigmore on Evidence (1961) § 2257.)

*In re Vaughan, supra,* 189 Cal. 491, 496, reasoned, "Although it has been held that an accusation is in the nature of a criminal charge [citation], and that a proceeding on such a charge is a *quasi*-criminal action [citation], 'this court has uniformly treated disbarment proceedings as peculiar to themselves, and governed exclusively by the code sections specifically covering them.' [Citation.] The purpose of such a proceeding is to determine the fitness of an officer of the court to continue in that capacity, and it has been said the disbarment of attorneys is not intended for the punishment of the individual but for the protection of the courts and the legal profession."

The above cited cases involving our state constitutional privilege against self-incrimination preceded *Malloy* v. *Hogan, supra,* 378 U.S. 1, and the question is presented whether with respect to the federal privilege against self-incrimination a different rule prevails than that under our state Constitution.

In *Spevack* v. *Klein,* 385 U.S. 511 [17 L.Ed.2d 574, 87 S.Ct. 625], an attorney in a disciplinary proceeding refused to honor a subpoena duces tecum by refusing to produce the demanded financial records and by refusing to testify at the judicial inquiry. His defense was that the production

---

[11]Evidence Code section 930 provides: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a defendant in a criminal case has a privilege not to be called as a witness and not to testify."

Evidence Code section 940 provides: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him."

of the records and his testimony would tend to incriminate him. The state court ordered him disbarred for his refusal, but the United States Supreme Court reversed, holding that an attorney may not be disbarred for claiming his privilege against self-incrimination. *Spevack* overruled *Cohen* v. *Hurley,* 366 U.S. 117 [6 L.Ed.2d 156, 81 S.Ct. 954], wherein an attorney, relying on his privilege against self-incrimination, refused to testify and was disbarred for his refusal, and it was held that the self-incrimination clause of the Fifth Amendment was inapplicable to the states.

Although *Spevack* suggests to at least one commentator that the United States Supreme Court would now regard a disciplinary proceeding as criminal for purposes of the Fifth Amendment privilege against self-incrimination (see 53 A.B.A.J. 631), courts and other commentators have expressly or impliedly rejected that view (*State Bar of Michigan* v. *Block,* 383 Mich. 384 [175 N.W.2d 769, 771 et seq.]; *In re Klebanoff,* 21 N.Y.2d 920 [289 N.Y.S.2d 755, 237 N.E.2d 75] [cert. den. 393 U.S. 840 (21 L.Ed.2d 110, 89 S.Ct. 118)]; *Zuckerman* v. *Greason,* 20 N.Y.2d 430 [285 N.Y.S.2d 1, 231 N.E.2d 718, 721] [cert. den. 390 U.S. 925 (19 L.Ed.2d 985, 88 S.Ct. 856); rehg. den. 390 U.S. 975 (19 L.Ed.2d 1196, 88 S.Ct. 1031)]; see *In re Selig,* 32 App.Div.2d 213 [302 N.Y.S.2d 94, 95-96]; *The Myth of Spevack* v. *Klein* by Michael Franck, 54 A.B.A.J. 970, 971-972; *Spevack* v. *Klein: Milestone or Millstone in Bar Discipline?* by Russell Niles and Judith Kaye, 53 A.B.A.J. 1121, 1124.) *Zuckerman,* for example, held that the sustaining of misconduct charges against two attorneys on the basis of testimony given by them allegedly under the compulsion of *Cohen* v. *Hurley, supra,* 366 U.S. 117, was not unconstitutional. *Zuckerman* stated that a disbarment proceeding is not a criminal case and that "The evidence which [the attorneys] produced . . . cannot be used against them in any criminal proceeding. They had no privilege against making disclosure usable only in a disciplinary proceeding." (P. 721.)

Neither *In re Ruffalo,* 390 U.S. 544, 550-551 [20 L.Ed.2d 117, 121-123, 88 S.Ct. 1222], nor *In re Gault, supra,* 387 U.S. 1, requires our holding that a disciplinary proceeding against an attorney is criminal for purposes of the federal constitutional privilege against self-incrimination. *Ruffalo,* in concluding that an attorney in a disciplinary proceeding is entitled to fair notice of the charge, states that such proceedings are of a "quasi-criminal nature. Cf. *In re Gault,* [*supra*] 387 U.S. 1, 33" and that "disbarment designed to protect the public, is a punishment or penalty imposed on the lawyer. (*Ex parte Garland,* 4 Wall. 333, 380; *Spevack* v. *Klein,* [*supra*] 385 U.S. 511, 515.)" However, *Ruffalo* "hardly stands for an equation of criminal and disciplinary proceedings, a most unlikely view." (*Kelly* v. *Greason,* 23 N.Y.2d 368 [296 N.Y.S.2d 937, 244 N.E.2d 456, 466].)

*In re Gault, supra,* 387 U.S. 1, 49, declared that "juvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the 'civil' label of convenience which has been attached to juvenile court proceedings." Disciplinary proceedings, however, unlike juvenile court proceedings, cannot result in incarceration, and, although they may result in disbarment, suspension, or censure, such a penalty is designed to protect the court and public from the official ministration of persons unfit to practice. (See *In re Echeles,* 430 F.2d 347, 349; *Zitny* v. *State Bar,* 64 Cal.2d 787, 790-791, fn. 1 [51 Cal. Rptr. 825, 415 P.2d 521]; *In re Vaughan, supra,* 189 Cal. 491, 496-497.)

■ We conclude that an attorney against whom a disciplinary proceeding is brought does not have the complete immunity from testifying of a defendant in a criminal case;[12] he may be called upon to testify but may decline to answer questions on the ground that his testimony would tend to incriminate him. ■ Here, by testifying fully without objecting to any question on the ground of the privilege against self-incrimination, petitioner waived it. (*United States* v. *Kordel,* 397 U.S. 1, 10 [25 L.Ed.2d 1, 9, 90 S.Ct. 763]; *Rogers* v. *United States,* 340 U.S. 367, 370-371 [95 L.Ed. 344, 347-348, 71 S.Ct. 438, 19 A.L.R.2d 378]; *Vajtauer* v. *Comm'r of Immigration,* 273 U.S. 103, 113 [71 L.Ed. 560, 566, 47 S.Ct. 302]; *Steinmetz* v. *Cal. State Board of Education,* 44 Cal.2d 816, 824 [285 P.2d 617] [cert. den. 351 U.S. 915 (100 L.Ed. 1448, 76 S.Ct. 708)]; see also *The Florida Bar* v. *Curry* (Fla.) 211 So.2d 169, 172 [cert. den. 393 U.S. 981 (21 L.Ed.2d 442, 89 S.Ct. 451)].)

■ Petitioner has cited no authority, and we have found none, requiring that in a disciplinary proceeding the State Bar give admonitions regarding the privilege against self-incrimination to an attorney represented by counsel. Under some circumstances admonitions must be given regarding the privilege against self-incrimination (e.g., *Miranda* v. *Arizona,* 384 U.S. 436, 467-469 [16 L.Ed.2d 694, 719-721, 86 S.Ct. 1602, 10 A.L.R. 3d 974] [to a defendant before custodial interrogation]; *In re Tahl,* 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449] [cert. den. 398 U.S. 911 (26 L.Ed.2d 72, 90 S.Ct. 1708)] [to a defendant who is pleading guilty]; *Killpatrick* v. *Superior Court, supra,* 153 Cal.App.2d 146, 149 [to unrepresented defendant in a criminal case]). However, the circumstances here differ substantially from those in the cited cases.

---

[12]We have also in other contexts regarded a disciplinary proceeding as not a criminal action. (See *Eschwig* v. *State Bar,* 1 Cal.3d 8, 18 [81 Cal.Rptr. 352, 459 P.2d 904, 35 A.L.R.3d 662]; *Best* v. *State Bar,* 57 Cal.2d 633, 637 [21 Cal.Rptr. 589, 371 P.2d 325].)

## II. *L.A. 29935*

### A. *The Facts*

Around February 10, 1969, petitioner received a $1,723 draft in settlement of a personal injury claim of his client, Patricia Brown. About February 21, 1969, after securing her endorsement on the draft, he deposited it in a specified trust account and told her she would receive her share ($817) within five or ten days.

The $1,723 was credited to the account on the date it was deposited, and no subsequent reversal of the entry is shown on the bank records. The account contained over $817 until March 20, 1969, but from that date until April 7, 1969, there was less than $817 in the account and on March 31, 1969, the balance was only $168.61.

Mrs. Brown testified: After she endorsed the draft she telephoned petitioner twice before receiving a check from him, and he told her "it was going to take quite a while for the draft to come through or something, and that he would issue me . . . one of his checks, and he would postdate it for the 3rd." On April 1 or 2, 1969, he gave her an $817 check on the account postdated for April 3, 1969. On April 3, and two subsequent occasions, when she tried to negotiate the check she was told by the bank that there were insufficient funds in the account. She talked to petitioner several times regarding the check. One time he said there was "a mistake there at the bank" and that the money "should be" there the next day, but when she returned the money was not there. He subsequently told her the money "would be in the bank shortly" and "he couldn't understand why it wasn't." She finally succeeded in negotiating the check on April 7 or 8, 1969. Prior thereto she had complained to the State Bar regarding the matter.

Petitioner, when asked what caused the delay in Mrs. Brown's receiving her money, testified: The draft was on an out-of-state bank, and he instructed his "girl" to tell him when it "would clear." He was a sole practitioner, had moved his office the prior summer, and had one "girl" after another. During the period in question he had three part-time secretaries. One secretary told him that the "draft would be cleared on the date that I made out the check to Mrs. Brown," which date he guessed was April 3, 1969. After writing the check he had to go to Palm Springs concerning a "disturbance" there. He was away several days and when he returned he "found that one girl had left, and she did not make deposits on some things, and on other things the checks that I had signed she had made out to various individuals whose deposits wasn't [*sic*] in the bank, plus . . . she left with about $900 of cash . . . [that] belonged to another client . . .

and so when Mrs. Brown called . . . I just . . . drew out monies of my own and put them in the account because I had been told . . . that in my absence Mrs. Brown had come in with a . . . tough looking guy, and said something to the effect she was going to shoot me . . . if Mrs. Brown didn't get her money . . . . [W]hen I started investigating I just couldn't make heads or tails out of what had gone on in my absence."

Petitioner further testified that he looked for his receipt books, checks, and "authorizations" for "so-called help" to sign the "check" but that the foregoing were either in a file that was missing from his attorney's car after an accident or were in the possession of his ex-wife or her lawyer, both of whom claimed not to have them. Other testimony by him suggests that he signed an authorization card regarding the trust account so that in an emergency his secretaries' names could be filled in and the card filed with the bank.

Petitioner also testified that he did not himself "keep the books or keep track of the bank statements at all. That was what I had asked my so-called help to do." According to petitioner, when he issued the check to Mrs. Brown he did not know there were insufficient funds in the account to pay the check and "was told that the monies were there," and he never knew there was less money in the account than the amount owed to her.

### B. *The Findings*

The local committee and board found in essence that in February 1969 petitioner concluded a settlement on Mrs. Brown's behalf and deposited the $1,723 draft in a trust account, that it was not until April 2, 1969, that he paid to Mrs. Brown her portion of the settlement by issuing to her a check dated April 3, 1969, drawn on the trust account, that from March 20, 1969, until April 6, 1969, the account contained insufficient funds to cover the check, that the check was dishonored when presented for payment by her, and that petitioner wrongfully converted the $817 belonging to her.

### C. *Whether Evidence Sustains Findings*

█ Petitioner asserts, without elaboration, that the finding that he wrongfully converted $817 belonging to Mrs. Brown is not supported by the evidence. This assertion does not sustain his burden of showing that the board's action is erroneous or unlawful. (Cf. *Simmons* v. *State Bar, supra,* 70 Cal.2d 361, 364-365.)

█ Furthermore, the recited evidence supports the finding that peti-

tioner wrongfully converted funds of Mrs. Brown.[13] It indisputably appears that the trust account into which petitioner deposited the draft (of which Mrs. Brown's share was $817) fell below $817 on March 20, 1969, and remained below that amount until April 7, 1969. Bank records show that the account was in the name of "Arthur S. Black Tr. Acct.," and no evidence was presented that an authorization was on file with the bank for anyone but petitioner to issue checks on the account. Although petitioner claimed he signed an authorization card so that his secretaries' names could be filled in and the card filed with the bank in an emergency, he did not testify that the card was ever filed with the bank, nor did he claim that anyone other than himself signed checks on the account.

Petitioner offered no evidence corroborating his testimony that one of his secretaries failed to make deposits, filled in checks, signed by him, for individuals whose deposits were not yet made, and misappropriated about $900 cash of another client. Furthermore, his testimony heretofore summarized, although unclear, suggests that the asserted failure and acts of his secretary may have occurred while he was away, and, according to his own testimony, this was not until April 1969, the month after the account fell below the amount owed to Mrs. Brown. Also the asserted misappropriation by his secretary of $900 belonging to another client would not, of course, in any manner by itself excuse petitioner's misappropriating Mrs. Brown's funds.

Petitioner's postdating the check he issued to Mrs. Brown appears to have been intentional[14] and such conduct together with her uncontradicted testimony showing that he changed his story as to when she would receive her share of the settlement constitutes clear and convincing proof that petitioner then knew of his failure to keep her trust funds inviolate and thus refutes his claim that he never knew the account contained less than the amount he owed her. Since he then had such knowledge, it may be inferred that he likewise had such knowledge when he misappropriated her funds.

Furthermore, even if petitioner's employees were in some manner re-

---

[13]Since the account never fell below $168.61, he may not have converted the entire $817, but whether he converted the entire sum or only a substantial portion thereof is not of great importance.

[14]As we have seen, the board and local committee found that on April 2, 1969, petitioner issued to Mrs. Brown a check dated April *3*, 1969. This finding is not challenged by petitioner and is supported by (1) Mrs. Brown's testimony that petitioner told her he would give her a check postdated for "the 3rd" and that he did so on April 1 or 2, 1969, and (2) two exhibits—the check dated April 3, 1969, and a note to her from petitioner dated April 2, 1969, stating that the check is enclosed. The foregoing evidence shows that the postdating was intentional.

sponsible for the account's containing insufficient funds to pay the amount owed Mrs. Brown and he did not know at the time he improperly withdrew her funds that he was misappropriating them, these facts would not exonerate him.

The requirement of rule 9, Rules of Professional Conduct, that unless the client otherwise directs in writing the client's funds be deposited in a trust account manifestly contemplates that they be retained therein. This rule is binding upon attorneys—not lay personnel—and necessitates reasonable supervision by an attorney of his staff in handling matters relating to a trust account. As we recently stated in *Vaughn* v. *State Bar,* 6 Cal.3d 847, 857 [100 Cal.Rptr. 713, 494 P.2d 1257], in the context of the misconduct there involved, "even though an attorney cannot be held responsible for every detail of office procedure, he must accept responsibility to supervise the work of his staff."

Here not only were there less funds in the trust account from March 20, 1969 through April 6, 1969, than the amount petitioner owed to Mrs. Brown, but on February 19, 1969, two days before he deposited her settlement check in the account, the account was overdrawn $165.17. Also a second trust account he maintained was overdrawn $109.82 on March 28, 1969. It is thus apparent that the accounts were being mismanaged and that he knew or should have known thereof.

In addition, as we have seen, there was clear and convincing proof that before he issued the check to Mrs. Brown he knew of his failure to keep her trust funds inviolate, and he nevertheless failed to deposit sufficient funds in the account to cover the check on the date appearing thereon. When she advised him the check had been dishonored, he blamed the bank and told her the funds "should be" there the next day, and he again failed to deposit the funds on that day and did not do so until several days later. The foregoing, together with the proof that he changed his story as to when she would receive her share of the settlement and that before she tried to negotiate his check he concealed from her his failure to hold her trust funds inviolate, warrants the conclusion that he was not acting in good faith and was guilty of gross negligence amounting to moral turpitude and a violation of his oath to discharge his duties as an attorney to the best of his knowledge and ability (Bus. & Prof. Code, §§ 6067, 6103, & 6106; see *Vaughn* v. *State Bar, supra,* 6 Cal.3d 847, 857-859; *Moore* v. *State Bar,* 62 Cal.2d 74, 81 [41 Cal.Rptr. 161, 396 P.2d 577]; *Call* v. *State Bar,* 45 Cal.2d 104, 110 [287 P.2d 761]). As observed in *Call* (at p. 111), "The good faith of an attorney is a matter to be considered in determining whether discipline should be imposed for acts done through ignorance or mistake."

### D. *Other Contentions of Petitioner*

■ Petitioner contends that "The proceedings are void . . . in that the State Bar made a demand in writing upon petitioner to make a statement in writing concerning the accusation . . . without giving petitioner an admonition that he had a constitutional and a statutory right to refuse to answer said demand . . . and that a refusal to make a reply could not be used against him. . . ." He does not identify the demand or cite any transcript references. Presumably he refers to a letter to him from the State Bar advising him that Mrs. Brown had filed a complaint and that to assist the State Bar in its consideration of the matter he "may submit a written statement relative to the complaint." When the State Bar examiner attempted to introduce into evidence petitioner's response to the letter, objections by petitioner to the receipt of the response were sustained. It thus does not appear that petitioner was prejudiced by the State Bar's letter. Furthermore, petitioner cites nothing supporting the contention.

■ Petitioner next contends that "The proceedings are void . . . in that pursuant to a demand . . . upon petitioner to appear before [the local committee], he did so appear and was interrogated by said committee without receiving an admonition that he had a . . . right under Article I, section 13 of the California Constitution, and under the Fifth Amendment as incorporated in the Fourteenth Amendment of the United States Constitution to refuse to be interrogated." He does not identify the nature of the asserted "demand." The record shows that petitioner, who was represented by counsel, took the stand in his own behalf in the instant proceeding. Following his direct testimony he was asked several questions by the committee, and he responded without objecting to any question on the ground of the privilege against self-incrimination. Under the circumstances he waived that privilege. (*United States* v. *Kordel, supra,* 397 U.S. 1, 10; *Rogers* v. *United States, supra,* 340 U.S. 367, 370-371; *Vajtauer* v. *Comm'r of Immigration, supra,* 273 U.S. 103, 113; *Steinmetz* v. *Cal. State Board of Education, supra,* 44 Cal.2d 816, 824 [cert. den. 351 U.S. 915]; see also *The Florida Bar* v. *Curry, supra,* 211 So.2d 169, 172.) In this proceeding, as in L.A. 29855, he has cited no authority requiring that in a disciplinary proceeding the State Bar give admonitions regarding the privilege against self-incrimination to an attorney represented by counsel.

■ Petitioner further contends, without citation of authority, that it was a violation of due process to consolidate for hearing two "unrelated accusations." Two proceedings against petitioner (L.A. 1944 [in which Mrs. Brown was the complaining witness] and L.A. 1962 [in which a Mrs. Heard

was the complaining witness]) were consolidated for hearing pursuant to rule 27, Rules of Procedure of the State Bar. After evidence was received, the local committee recommended dismissal of L.A. 1962, and the board dismissed it. Under the circumstances it does not appear that petitioner was prejudiced by the consolidation.

### III. *Discipline To Be Imposed*

As heretofore stated, the board has recommended in L.A. 29855 three months' suspension and in L.A. 29935 three months' suspension in addition to any imposed in L.A. 29855.

In each proceeding petitioner asserts that the discipline recommended is "unwarranted," presumably on the theory that the evidence does not support the findings and that he was not guilty of any misconduct justifying discipline, but, as we have seen, that contention is without merit. Thus petitioner has not met his burden of showing that the recommendation is erroneous in either proceeding.

 Furthermore six months' suspension appears warranted by the circumstances here existing. Although it does not appear that petitioner has a prior disciplinary record, the records in the instant proceedings establish that during a period of about two and a half years he was guilty of reprehensible conduct in connection with his handling of trust funds of two clients. In each instance he ultimately made restitution, but he was aware that a complaint had been filed with the State Bar in the Turrentine matter before he made restitution to either client, and Mrs. Brown had made repeated demands on him for payment before he made restitution to her.

We order that petitioner be suspended from the practice of law for six months, effective thirty days from the filing of this opinion.