[Civ. No. 38744. Second Dist., Div. Three. May 9, 1973.]

REALTY PROJECTS, INC., et al., Plaintiffs and Appellants, v. BURTON E. SMITH, as Real Estate Commissioner, et al., Defendants and Respondents.

Ball, Hunt, Hart, Brown & Baerwitz, John R. McDonough and Joel M. Lawlor for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, and Arthur C. de Goede, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**COBEY, Acting P. J.**—Appellants, Realty Projects, Inc., Stanley Zimmerman, Richard Greenberg and Frances Varela, appeal from a judgment denying them a writ of mandate that would have directed the Department of Real Estate to set aside its decision and order suspending and revoking their real estate licenses. ·

The basic issue of this appeal is whether under the Real Estate Law licensed real estate brokers and salesmen, when acting as mortgage loan brokers and loan officers, are obligated to disclose to prospective borrowers, who indicate they need loans within the monetary limits below which the compensation, etc., of such brokers are statutorily limited, that, if

these borrowers accept the suggestion of the loan officers that they seek loans exceeding these statutory limits, the statutory ceilings upon the broker's compensation, etc., will no longer obtain.[1] We hold that appellants as real estate licensees dealing in their licensed capacities with prospective borrowers are so obligated.[2]

## FACTS

Realty, Zimmerman and Greenberg are licensed mortgage loan brokers; Varela is a licensed mortgage loan saleswoman.[3]

In 1967, the year in which the loans under review were made, Zimmerman, the secretary of Realty, was in charge of its day-to-day operations and Greenberg and Varela were two of its loan officers. Realty did business under the name of Mortgage Refinance Company. Through various of its employees, including appellants, it negotiated and obtained loans from private individual lenders for borrowers who employed Realty as their agent for this limited purpose and who paid Realty a commission for this service. The loans were secured by trust deeds on real estate usually owned by the borrowers.

Realty entered the mortgage loan brokerage business in 1955. In 1967 some 25,000 prospective borrowers a year called at its offices to inquire about real estate loans of whom approximately 10 percent actually negotiated loans through Realty. About 95 percent of the loans so negotiated by Realty were loans in which the maximum compensation, etc., of Realty was controlled by the ceilings specified in section 10242. On these loans Realty apparently took from the loan proceeds made available to the borrower a commission in cash.

About January 1967, because the market for funds available for these real estate loans was shrinking, Realty commenced the practice of reducing the amounts of cash their lenders would have to provide in situations where

---

[1]We refer to Business and Professions Code section 10245, which provides that the ceilings on the compensation, etc., of brokers prescribed in section 10242 of the Necessitous Borrower's Act do not apply to bona fide loans secured by first trust deeds of $12,000 or more or by junior liens of $6,000 or more. At the time of the loans under review (1967) these statutory limits were respectively $10,000 and $5,000. (See Stats. 1961, ch. 886, § 24, p. 2339.)

All section references hereafter are to the Business and Professions Code unless otherwise indicated.

[2]Since 1919 mortgage loan brokers and their loan officers have been required to hold real estate licenses. (See § 10131, subd. (d); Stats. 1919, ch. 605, § 2, p. 1252; *Tushner* v. *Savage*, 219 Cal.App.2d 71, 77 [33 Cal.Rptr. 247].)

[3]Stay orders have kept appellants' licenses in effect pending the final determination of these disciplinary proceedings.

the loans exceeded the limits within which Realty's compensation, etc., was regulated by section 10242 by adopting the practice of sometimes taking its commission from the borrower in the form of a promissory note secured by a junior deed of trust on real estate. During 1967 Realty negotiated 100 to 150 loans of this character.

Zimmerman conducted meetings of Realty's loan officers every business day as part of a continuous training program.[4] At these meetings loan files were reviewed for problems in some detail and those present would be instructed by Zimmerman on any changes in Realty's policies and practices. The loan officers were told to obtain from customers authorization for the highest loans possible so that Realty might receive the highest commissions possible. With the exception of Greenberg, the loan officers received from Realty $150 per loan for each loan negotiated. If they negotiated an unregulated loan, they received additional compensation from Realty in the form of 10 percent of the commission Realty charged.

The loan officers recevied no instructions on whether they should advise prospective borrowers of the limits on loans (then $10,000 for first trust deeds, then $5,000 for junior trust deeds) beyond which Realty's compensation, etc., was unlimited by law. Accordingly, the loan officers made no such disclosure to any prospective borrower.

Zimmerman instructed the loan officers to include credit life and disability insurance in their loans whenever possible.[5] The writing of this insurance was for Realty's benefit as well as that of the borrower since Realty advertised to its prospective lenders that they would never lose a penny on any real estate loans they placed through Realty and in order to make this claim good, Realty itself always took over any defaulting loans from its lenders and paid them off in full.

In five transactions occurring in February, March and July 1967 and involving as loan officers appellants Greenberg and Varela and one other loan officer, John Mennitto (who is not a party to these mandamus proceedings),[6] the prime and controlling cause of *the amount* of each of the loans was the desire by Realty and its loan officers to place the amount of the loan above the statutory limits for regulated loans so that the various borrowers could be charged commissions substantially in excess of those

---

[4]Zimmerman also conducted individual training sessions with loan officers.

[5]The majority shareholders of the licensed corporate life insurance broker, through which this credit insurance was sold, were Zimmerman's brother-in-law and his sister. Zimmerman himself was a minor shareholder of this corporation.

[6]The department stayed the revocation of Mennitto's real estate license.

permitted on regulated loans. In other words, there was no other economic justification for pushing these loans up into the unregulated area. In each transaction the borrower or borrowers indicated that he or they needed a loan within the statutory limits for regulated loans under the Necessitous Borrower's Act but, as just indicated, authorized and received loans in excess of those limits at the suggestion of the loan officers.[7] In each of the transactions the respective borrower or borrowers did not know and were not aware that if they obtained loans through Realty that were below the statutory limits, Realty could not have lawfully charged them commissions in excess of the statutory ceilings. Realty and its loan officers knew both the limits of regulated loans and the consequences of exceeding those limits in the possible commissions, etc., Realty could lawfully charge these borrowers. Nevertheless Realty and its loan officers failed to disclose these facts to these prospective borrowers before they authorized the obtaining of the loans suggested to them by Realty.

### Positions of the Parties

The department found that the foregoing conduct on the part of appellants constituted substantial misrepresentation, fraud and dishonest dealing in violation of section 10176, subdivisions (a) and (i) and section 10177, subdivision (j). These constitute the fundamental findings. The department also found that appellants willfully disregarded the provisions of the Real Estate Law in violation of section 10177, subdivision (d) and that they had conducted themselves in a manner that would have warranted the denial of real estate licenses to them under section 10177, subdivision (f).[8] (See § 10152.) The trial court found all of these findings, including the fundamental ones, to be supported by the weight of the evidence as it determined that weight.

Appellants principally contend that: (1) no legal basis exists for the claimed duty of disclosure; (2) the imposition of sanctions under the circumstances of this case constitutes a violation of constitutional due process; (3) the standard of proof used by the department's hearing officer was

---

[7]The significant details of the five loans (Snyder, Smith, Miranda, Mendez, Arevalo) are set forth in the concluding portion of this opinion under the heading "Substantial Evidence." Realty and its loan officers pushed the Snyder and Arevalo loans above the limits of regulated loans through the sale to the borrowers of excessive credit insurance. Realty's commissions on these five loans totaled $12,500. If these loans had been made within the regulated limits Realty's commissions could not have exceeded $4,062.50.

[8]All of these findings also include Mennitto.

contrary to law; (4) the essential findings of the trial court are not supported by substantial evidence.[9]

## THERE WAS A LIMITED STATUTORY DUTY TO DISCLOSE

■ Appellants argue that the limited duty of disclosure imposed upon them in the disciplinary proceedings under review constitutes an unwarranted extension of the explicit requirements of the Necessitous Borrower's Act and cannot be legally justified on the basis of any fiduciary duty existing between prospective borrowers and the loan officers since such a duty cannot exist before the establishment of the agency relationship and that relationship does not come into existence until the loan authorization agreement has been executed by the borrower and by the loan officer.

This argument rests on certain misconceptions. First, the disciplinary proceedings before us are not based upon the requirements of the Necessitous Borrower's Act. Rather they rest on the statutory duty, under the Real Estate Law, of fair and honest dealing imposed upon all real estate licensees (brokers and salesmen), when acting as or for mortgage loan brokers, in all of their dealings as such licensees.[10] (See § § 10000, 10131, subd. (d), 10176, subds. (a) and (i).) Second, this statutory duty of fair and honest dealing by licensees, when acting as licensees, extends to their dealings with prospective borrowers before the execution of any loan authorization agreement by the loan officer and the prospective borrower.

Mortgage loan brokers and their loan officers, such as appellants here, hold themselves out to prospective borrowers as loan experts who will endeavor to obtain for prospective borrowers from lenders a loan adequate for their needs and at the lowest practicable cost. The prospective borrower, when he commences negotiating with a loan officer of a mortgage

---

[9]Appellants also contend that material findings requested by them were not made by the trial court. We have reviewed their requests and find no error in denying them. Appellants also claim that there is no evidence that Realty and Zimmerman had "guilty knowledge" under section 10179 of the statutory violations of the loan officers. We hold that in view of Zimmerman's group and individual training sessions with the loan officers on how they should obtain loan applications from prospective borrowers and his lack of instructions as to whether the loan officers should disclose to prospective borrowers the statutory limits of regulated loans, an inference of guilty knowledge on the part of both Realty and Zimmerman of the statutory violations by the loan officers is quite reasonable. In an appellate review such as this, we must indulge in all legitimate reasonable inferences to uphold the findings of the trial court. (See *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301, 308 [196 P.2d 20].)

[10]This statutory duty embodies a status approach. (See Tobriner, *Retrospect: Ten Years on the California Supreme Court* (1972) 20 U.C.L.A. L.Rev. 5, 8-10.)

loan broker, is interested primarily in two things—how much money can he obtain on the security of his interest in certain real property and how much is the loan going to cost him. When he indicates to the loan officer that the total sum needed by him falls within the loan limits below which the compensation, etc., of the broker is regulated and the loan officer then suggests, without any other economic justification therefor, the possibility of a higher loan exceeding the applicable limit of a regulated loan, simple honesty and fair dealing demand that the expert inform the non-expert that if the latter borrows above this limit, he will be subjected to a broker's commission and escrow fees and charges substantially in excess of the ceilings for such expenses imposed by the Necessitous Borrower's Act. (Cf. *Rattray* v. *Scudder,* 28 Cal.2d 214, 223 [169 P.2d 371, 164 A.L.R. 1356].) The reasonable expectation of the prospective borrower is that the loan officer will provide him with an accurate picture of what various loans under consideration will cost him and why they will vary in cost. A significant factor in the cost of any particular loan is the broker's commission and the escrow expenses incident to the loan. The amount of this expense will vary depending on whether this expense is, or is not, limited by law. The knowing concealment from a prospective borrower by the loan officer of such a significant factor in the possible cost of a loan constitutes a substantial misrepresentation of the overall loan picture facing the prospective borrower.[11] It also amounts to fraud and deceit. (Cf. Civ. Code, §§ 1572, subds. 3, 5, 1710, subd. 3.)

---

[11]In reaching this conclusion we find relevant the following language from the Legislature's statement of the reasons for the enactment in 1955 of the Necessitous Borrower's Act.

"The Legislature finds the necessity for the enactment of the legislation contained in this act to be as follows: In many parts of the State, citizens of small means who are in need of borrowing money through loans secured by liens on real estate, especially, but not entirely, on deeds of trust, representing equities on their home property, are being required and induced to pay exorbitant and excessive fees and charges to persons negotiating said loans in the form of brokerage commissions and costs and expenses in great disproportion to the amount of money actually received. Such brokerage and charges are secured through the writing of loans for periods of one and two years, with final payments beyond the ability of the borrower to pay. This large final payment requires the borrower to renew or refinance the loan and thereby to pay another brokerage fee, and to incur additional costs and expenses. The total amount of the charges, costs and expenses, and interest become in the aggregate so high that such necessitous persons are faced with the loss of their security, or are finding themselves continuing in debt far beyond the normal amortization period of the loan. . . ." (Stats. 1955, ch. 1791, § 12, p. 3305.)

We do not decide whether the statutory duty of disclosure extends beyond the point we have indicated. We decide only its extent in this case.

## The Disciplinary Statutes Are Constitutional[12]

The foregoing rationale also disposes of appellants' second contention that they were not accorded constitutional due process because they had no prior notice in the applicable statutes (§§ 10176 and 10177) of what was required of them. Such prior notice did exist in these statutes specifically proscribing fraud, substantial misrepresentation and dishonest dealing. These statutes are not unconstitutionally vague. (See *Denny* v. *Watson*, 114 Cal.App.2d 491, 493, 495 [250 P.2d 692]; *Dyer* v. *Watson*, 121 Cal.App.2d 84, 94 [262 P.2d 873].) Undoubtedly the department could have proceeded against this misconduct of appellants' in a less harsh manner than the disciplinary proceedings before us, but it was not constitutionally compelled to do so.

### Administrative Standard of Proof

■■■ Appellants contend that the department, through its hearing officer, applied the wrong standard of proof in determining that appellants violated the aforementioned disciplinary statutes in the manner already described. In administrative proceedings involving the disciplining of licensees the correct standard of proof to be applied would appear to be "convincing proof to a reasonable certainty." (See *Furman* v. *State Bar*, 12 Cal.2d 212, 229 [83 P.2d 12]; *Small* v. *Smith*, 16 Cal.App.3d 450, 457 [94 Cal.Rptr. 136].)

Appellants contend that in this case the department's hearing officer did not use this standard of proof. The hearing officer in his findings, which the department adopted, did not state the standard of proof that he followed in finding appellants guilty of the statutory violations we have already related. Appellants, therefore, base this contention that he applied a lesser erroneous standard of proof upon the fact that in finding a non-violation in another loan transaction not before us he found that "the department has failed to carry its burden of proof by a preponderance of convincing evidence."

The inference that appellants ask us to draw from this language is a reasonable one, but we are not compelled to draw it. Against this inference must be placed the rebuttable presumption that "official duty has been regularly performed." (See Evid. Code, §§ 600, subd. (b), 601, 606,

---

[12]Appellants have raised one other constitutional issue. They assert that Greenberg was denied constitutional due process because the department's hearing officer found that he, a licensed insurance salesman, violated Insurance Code section 779.4 in making the Snyder loan and that such violation was not charged in the accusation. This is true but of no consequence. In determining the issues before him and, therefore, the basis for the discipline recommended against Greenberg, the hearing officer made no determination with respect to this uncharged Insurance Code violation. Thus, Greenberg suffered no prejudice by reason of this claimed error.

664; *Lumbermen's Mut. Cas. Co.* v. *Ind. Acc. Com.,* 29 Cal.2d 492, 501 [175 P.2d 823].) Furthermore, the omission of the words "to a reasonable certainty" may have been inadvertent shorthand. ▮ Administrative findings need not be stated with the formality required of judicial findings (see *Temescal Water Co.* v. *Dept. Public Works,* 44 Cal.2d 90, 102 [280 P.2d 1]) and are to be liberally construed to support rather than defeat the order under review. (See *Jack P. Meyers, Inc.* v. *Alcoholic Bev. etc. Appeals Bd.,* 238 Cal.App.2d 869, 873 [48 Cal.Rptr. 259].)

▮ Moreover, there is a second ground for rejecting this contention of appellants. This is that appellants are precluded from raising this contention in this court because they failed to advance it in the same form in the trial court. (See *Small* v. *Smith, supra,* 16 Cal.App.3d 450, 458.) In other words they waived it by not raising it in the trial court.

It is true that in their petition for a writ of mandate they alleged that the standard of proof employed by the hearing officer was "insufficient and contrary to law." But in support of this allegation they repeatedly argued, both in writing and orally, to the trial court that the proper standard of proof to be used in a disciplinary proceeding against a licensee was the one required in criminal trials in court—namely, proof beyond a reasonable doubt. This is not the law. (See *Webster* v. *Board of Dental Examiners,* 17 Cal.2d 534, 537-539 [110 P.2d 992]; *Black* v. *State Bar,* 7 Cal.3d 676, 687 [103 Cal.Rptr. 288, 499 P.2d 968].)

Appellants, having challenged the standard of proof allegedly employed by the hearing officer on a different basis in the trial court (the initially reviewing court) than they do here, are precluded in this court from changing the basis for their challenge. They are deemed to have waived their present ground of challenge by not having raised it in the initially reviewing court.

SUBSTANTIAL EVIDENCE[13]

A. *The Snyder Loan*

▮ On March 8, 1967, Realty, through its loan officer, Greenberg, discussed with Roy Snyder, a married truck driver, the possibility of Snyder's obtaining a loan through Realty, secured by a trust deed on his home.

---

[13]In reviewing the sufficiency of the evidence to support the findings of the initially reviewing court, we determine only whether the findings are supported by substantial evidence. (See *Bixby* v. *Pierno,* 4 Cal.3d 130, 149 [93 Cal.Rptr. 234, 481 P.2d 242]; *Wahl* v. *Division of Real Estate,* 197 Cal.App.2d 97, 100 [17 Cal.Rptr. 25].)

The home was owned by Snyder's mother. Greenberg told Snyder that he would have to have her authorization in order to use this real property as security for any loan. Snyder thereupon obtained such authorization.

Snyder requested "about $4,000" to pay various bills. Greenberg suggested to Snyder that he seek a three-year cash loan of $5,250—$250 over the applicable limit for a regulated loan. (See § 10245 as it read in 1967.) Snyder agreed to the suggestion. From this loan of $5,250 Snyder received a net of $3,874.60 to pay bills in this amount. He authorized Realty to retain from the proceeds of the loan $1,375.40 of which $1,-117.20 represented the one-time premium on two $10,000 credit life and disability insurance policies on Snyder and his wife, who was not a party to the loan transaction. Greenberg told Snyder that he would have to have this insurance in order to obtain the loan. Snyder executed and delivered to Realty a second promissory note secured by a second trust deed on his mother's real property in the amount of $2,500 as Realty's commission for obtaining the $5,250 loan. Snyder thus became obligated to pay $7,750 for a loan netting him in cash $3,874.60. Had Snyder's loan been the maximum regulated one of $4,999.99, the maximum commission that Realty could have charged would have been approximately $750. Snyder's purchase of the credit insurance was excessive, both in amount and cost, and was made only because Greenberg suggested it. Greenberg did so in order to get the principal amount of the loan above the applicable statutory maximum for a regulated loan.

Appellants, Realty, Zimmerman and Greenberg, attack this finding of the causation of the amount of the loan as being unsupported by substantial evidence on the basis that Snyder's initial request of Greenberg was for a $4,400 loan which, when Realty's regulated commission and escrow expenses were added, would have exceeded the aforementioned statutory maximum for regulated loans of $4,999.99. It is true that Snyder testified three times at the administrative hearing that $4,400 was the amount of his initial request for a loan. It is also true that Greenberg was expressly uncertain when he testified that Snyder's initial request of him was for a loan of "somewhere around $4,000." But in view of Snyder's final acceptance of a loan netting him in cash only $3,874.60, it does not seem unreasonable that Greenberg's recollection as to the amount of Snyder's initial request for a loan may have been more accurate than Snyder's.

In this connection it must be borne in mind that when the sufficiency of the evidence is attacked on appeal from a judgment in mandamus, we must resolve all conflicts in the evidence in favor of the prevailing party,

and indulge in all reasonable inferences in support of the finding under attack. (See *Moran* v. *Board of Medical Examiners, supra,* 32 Cal.2d 301, 308-309.) Accordingly, we hold that the trial court's finding of the causation of the amount of the Snyder loan is supported by substantial evidence.

### B. *The Smith Loan*

On February 5, 1967, Realty, through its loan officer, John Mennitto, discussed with Johnnie and Audrey Smith, husband and wife, at their request and in their home, a loan to pay off a promissory note coming due (which was secured by a second deed of trust on their property), a Bank of America loan for home repairs and $300 for some dental work that had to be done at once. Somewhat over $3,800 was needed for these purposes.[14] In the course of this discussion other outstanding bills of the Smiths were mentioned and Mennitto, for Realty, recommended that the Smiths pay off some of these bills as well by increasing the loan they sought to $5,250. The Smiths agreed to the recommended amount which provided them with $1,475.68 to pay other unpaid bills, but obligated them to pay over a three-year period, in addition to the gross cash loan of $5,250, a secured promissory note in favor of Realty for its commission in the amount of $1,500. Mennitto, by pushing the Smith loan over the applicable regulated loan limit of $4,999.99, was able to increase Realty's commission on the loan from about $750 to $1,500.

Appellants, Realty and Zimmerman, contend that the trial court's finding that the amount of this loan was so caused is not supported by substantial evidence. They base this contention on the fact that the record is silent as to how the other unpaid bills of the Smiths came up during their discussion with Mennitto. They argue that this fact establishes a failure of proof of the causation which the court found.

We disagree. Under the *Moran* rule of appellate review stated earlier, we must view the record in the light most favorable to the department. This means that we must infer that the decision of the Smiths to seek the substantially larger loan of $5,250 was induced by Mennitto so that Realty might obtain a substantially greater commission on the loan, regardless of how the other unpaid bills of the Smiths came up during their discussion with Mennitto.

---

[14]The trial court found that the Smiths requested $3,700 for these purposes, but the Smiths testified that they never asked Realty and Mennitto for a loan in any specific amount and that they sought a loan sufficient to pay off the second trust deed on their home and to provide as well the money for the necessary dental work. They further testified that the suggestion to pay off the Bank of America loan of $565 came from Mennitto.

The trial court's finding that the Smiths requested $3,700 would appear to be in error.

### C. *The Miranda Loan*

On March 20, 1967, Realty, through its loan officer, Frances Varela, discussed with Irene Miranda, a widow, the possibility of her obtaining a loan through Realty on a three-apartment dwelling house she owned. Mrs. Miranda lived in one apartment and rented out the other two. She wanted $8,000, principally (1) to refinance an existing loan on the property from Prudential Loan Company which she estimated to be $3,225, (2) for repairs to the property and (3) for money to pay some bills. Varela, after inquiring about Mrs. Miranda's income, advised her that she qualified for a $10,000 loan and thereupon wrote up for her the requisite authorization for a loan in the amount of $10,250 (the maximum for a regulated loan of this type being $9,999.99). Varela also had her execute at this time a note for Realty's commission in the amount of $3,000, secured by a second deed of trust on the property. Thus, Varela increased the loan sought by Mrs. Miranda from $8,000 to $10,250 in order to increase Realty's commission on the loan from $1,000 to $3,000.

Appellants, Realty, Zimmerman and Varela, contend that this finding of causation for the increase in the loan is not supported by substantial evidence because Mrs. Miranda's needs, as discussed with Varela, amounted to at least $9,421. In so contending, they ignore, however, the evidence that Mrs. Miranda came to Realty from Prudential after having applied there for an $8,000 loan and having been cleared there for a $7,200 loan. It would seem reasonable to infer from these circumstances that Mrs. Miranda's initial loan request to Realty was likewise for $8,000.[15]

We hold that under the *Moran* rule of appellate review the trial court's finding of the causation of the amount of this loan is supported by substantial evidence.

### D. *The Mendez Loan*

On July 14, 1967, Realty, through its loan officer, Frances Varela, discussed with Joe and Carmen Mendez a possible loan secured by real estate. They initially requested $3,000 and ultimately received in cash from Realty $2,897 from a gross loan of $10,300 written by Varela and obtained

---

[15]Appellants, Realty, Zimmerman and Varela, argue that this inference is illogical since Mrs. Miranda, before coming to Realty from Prudential, had become obligated to pay to Prudential close to $800 as Prudential's commission for the $7,200 loan it had obtained for her, which she had refused. But Mrs. Miranda's testimony indicates that she could be illogical in loan matters since she came to Realty from Prudential because of Prudential's insistence that she pay off its outstanding loan on her property from its proposed new loan to her and then used part of the loan she obtained through Realty to do exactly that.

through Realty. The Mendezes also became obligated to pay Realty as Realty's commission for obtaining this loan for them a promissory note in the amount of $2,500 secured by a junior deed of trust on their home and on another or second parcel of real property they owned. The loan was used in part to pay off the prior encumbrance on the second parcel.

The Mendez' home was encumbered by a secured loan of $7,000 from the Bank of America. The other or second parcel was also encumbered by a secured loan from a savings and loan association in the amount of about $6,800. Realty, however, appraised both parcels and decided that the Mendez' equity in each was $8,000 and $7,000 respectively.

As already indicated partially, in order to pay some bills, the Mendezes sought a loan of $3,000 secured by a second deed of trust on their second parcel. Varela suggested that they seek instead a larger loan and pay off both of the existing encumbrances. Mr. Mendez replied that they did not wish to encumber their home further. Varela's rejoinder was that they would have to encumber both parcels as they could not obtain a second deed of trust on their equity of $7,000 in the second parcel.

A loan secured by a second deed of trust on one or both the Mendez' parcels in the amount of $3,750 would have netted the Mendezes more cash than they actually received from the $10,300 loan and Realty's commission on a loan in this amount would have been $562.50 instead of the $2,500 it obtained from the much larger unregulated loan. Varela proposed the refinancing of one of the outstanding secured loans of the Mendezes in order to obtain for Realty this very substantial increase in its commission.

Appellants, Realty, Zimmerman and Varela, attack this finding of the causation of the amount of this loan as unsupported by substantial evidence. They do so principally on the basis that in view of the admittedly tight money market that existed in 1967 for loans secured by real estate, there is no evidence in the record indicating that a loan secured by a second deed of trust alone would have been obtainable. But, equally, there is no evidence establishing its unobtainability and, in view of the Mendez' total equity in their real property of $15,000, it seems unreasonable to infer to the contrary. We hold that the trial court's finding of the causation of the amount of the loan actually made through Realty is supported by substantial evidence.

## E. *The Arevalo Loan*

On March 9, 1967, Realty, through its loan officer, Frances Varela, discussed with Mrs. Micaela Arevalo the possibility of her obtaining a loan

secured by her real property. In this discussion Mrs. Arevalo was assisted by her adult son, Valdo Sanchez, who lived with her. At this time Varela knew that Mrs. Arevalo had lien obligations on her real property that she had to meet of about $8,280. Furthermore, Realty had already appraised her property as being worth about $27,000. A regulated loan of $9,999.99 on this property would have more than taken care of the lien obligations on it and would have more than paid all loan expenses including a cash commission to Realty of $1,000. Instead Varela wrote up an unregulated loan of $10,250 which called for an additional commission note, secured by a second deed of trust, in favor of Realty in the amount of $3,000. In other words, Mrs. Arevalo's total loan obligation was $13,250. Varela did this in order to increase Realty's commission from a maximum of $1,000 on a regulated loan to $3,000 on an unregulated loan.[16]

Appellants, Realty, Zimmerman and Varela, in contrast to their position on the other four loans, do not actually challenge the sufficiency of the evidence supporting the foregoing finding as to the causation of the amount of the loan made Mrs. Arevalo. Instead, their claim is that the trial court erred in not granting their request that it specifically find that Valdo Sanchez represented his mother in negotiating the $13,250 obligation. Such a finding is not material. What is of legal consequence here is the causation of the amount of the loan and not the representation of the borrower in negotiating it.

We hold that the trial court's finding as to the causation for the amount of this loan is supported by substantial evidence.

The judgment is affirmed.

Schweitzer, J., and Allport, J., concurred.

A petition for a rehearing was denied June 5, 1973, and the opinion was modified to read as printed above on June 5 and 8, 1973. The petition of appellants Realty Projects, Inc. and Zimmerman for a hearing by the Supreme Court was denied July 6, 1973.

---

[16]This increase in the amount of the loan was necessitated by the payment from its proceeds of $1,051.54 for a one-time premium in this amount upon a policy of credit insurance covering both of Mrs. Arevalo's sons. Such insurance was clearly excessive in cost.